[Crim. No. 5082. Second Dist., Div. Three. Mar. 25, 1954.]

THE PEOPLE, Respondent, v. SAMMY LEE DAVIS, Appellant.

Gerald J. Levie, Kaufman & Leland and Sidney W. Kaufman for Appellant.

Edmund G. Brown, Attorney General, and Martin M. Ostrow, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was convicted of four counts of receiving stolen property. He appeals from the judgment and from the order denying his motion for a new trial.

During the night of September 19, 1952, a machine shop or service department of an automobile company in Fullerton was burglarized and certain machinery and tools were stolen therefrom.

During the night of October 14, 1952, a machine shop of a sales company in Santa Monica was burglarized and certain machinery, tools and tires were stolen therefrom.

During the night of October 15, 1952, a jewelry store in Pismo Beach was burglarized and about 95 new watches, about 50 repaired watches, some wedding and other rings, and diamonds were stolen therefrom.

During the night of October 27, 1952, a garage of an automobile company in Huntington Beach was burglarized and certain machinery, tools, tires, a typewriter, and an adding machine were taken therefrom.

On December 1, 1952, police officers arrested defendant at his home where he and his mother resided. In that home the officers found many articles of machinery, many watches and other items of jewelry, many tools, an adding machine and a typewriter which had been stolen from said burglarized places. The articles of machinery included a power drill, hydraulic valve lift, valve refacer, power buffers, a sander, and a timing light. Said stolen property was identified by the owners of said burglarized places as property that was stolen from said places on the above-mentioned dates. The portion of the property which belonged to each respective owner was returned to him. The owner of the automobile company in Fullerton testified that the reasonable value (as of the date of the burglary) of the property returned to him was $1,000 to $1,200 approximately. The owner of the jewelry store testified that the reasonable value (as of the date of the burglary) of the watches and jewelry returned to him was $4,000 to $5,000 approximately. The owner of the automobile company in Huntington Beach testified that the reasonable value (as of the date of the burglary) of the property returned to him was as follows: typewriter about $75; adding machine $150; and four tires $15 each.

An officer testified that defendant said that he bought the typewriter and adding machine from some Marines by the names of Ward, Brush, and Bell and he paid $50 for them;

the boys wanted $1,000 for the jewelry but he paid them $310 for it; he paid those boys over $700 for the tools and the jewelry; they were fellows who hung around Clisby's garage; he had not known them very long; he did not know what business they were in, but the talk around the garage was they were Marine deserters.

The officer also testified that on December 1, 1952, prior to the arrest of defendant, he and four other officers entered defendant's house when defendant was absent, and they waited therein for his return; there was a porch at the front of the house; about 9 p.m. defendant came up on the porch and entered the room; before the defendant entered, the officer (witness) heard a noise which sounded like an object dropping on wood; when defendant entered the room he said, "What is this all about?"; the officer said, "[L]ook at all the jewelry we have laid out on the bed there. I think you have a pretty good idea."; defendant said, "That is junk jewelry, just old stuff I have accumulated over a period of time."; the officer said, "We are looking for a satchel with jewelry in it. Where is the satchel?"; defendant said, "I don't know what you are talking about."; then the officer went upon the porch and found a satchel—a canvas bag up against the side of the house; he brought the satchel into the room and opened it—it contained about 20 articles of new jewelry, watches, and rings in cases; then defendant said that he bought that jewelry from the Marines above mentioned.

The officer testified further that he asked the defendant about the tools which were found in the basement; defendant said that he had been in the wrecking business and he had had all the tools for two years; the officer asked him about the power tools; he replied that he had had everything for two years, he could not remember where he got each article, he had been working for Lockheed since March and he did not get anything since he had been working there; thereafter the officer showed him a teletype which described and gave the serial numbers of the tools, and it also stated that the tools were taken in a recent burglary—after March; the officer then told him that his story about not getting any tools since March was not possible; defendant said, "Yes, that's right, I bought these tools, I bought them from two Marines, Bobby Joe Brush and Dick Ward."

The officer testified further that he asked defendant about a ring that was on defendant's finger, upon which ring there was inscribed "L 1940"; he replied that he got it when he gradu-

ated from Lincoln High School in 1940. The next day the officers, in referring to that ring, told defendant that officers had found another ring with the same date on it; defendant then said that the ring was not his graduation ring, that he had bought it from the same Marines.

Another officer testified that, about three weeks after the arrest, he asked defendant if he had ever left any watches, that were involved in the Pismo Beach burglary, with a Mr. Chastain, a watch repairer; he replied, ''No''; the officer asked him if he was sure about that; defendant replied that he was sure.

Mr. Chastain, a watch repairman, testified that he had known defendant about 12 years; that in October, 1952, defendant brought three watches to him to be repaired. Those watches were identified as watches that were stolen from the Pismo Beach store.

Richard Ward, called as a witness by the People, testified that he was serving a term in a state prison for burglary committed in Orange County; he had known defendant about seven months—having met him about July, 1952, at Clisby's garage; at the time he met defendant he (witness) was in the Marine Corps, and he was introduced by Bob Brush, another Marine, who said, at that time, that defendant would buy anything that they would bring to him; defendant then said that he would like to get some tires and that he was interested in tools and power tools; they said they would see what they could do and then they would see him. He testified further that on September 20, 1952, about 1 a.m., he and Brush entered a building in Fullerton, which was occupied by an automobile company, and took therefrom several tools and a grinding machine; they did not have permission of the company to enter the building or to take anything therefrom; the next day they took said articles to defendant's home; they and defendant argued over the price ''we wanted,'' and defendant wanted to know if they got the things outside Los Angeles County—that he did not want anything that was in the county because it could be traced to him too easily; they told him it was outside the county and he would not have to worry about the property being traced; they sold said property to defendant for $110 or $115, and they put all the property in his cellar. He testified further that in October, 1952, about 2 a.m., he and Bill Bell entered a building in Santa Monica, which was occupied by an automobile company, and took therefrom two new tires, several tool boxes, and a drill or two; they did not have permission of the

company to enter the building or to take anything therefrom; the next evening they took said articles to defendant's home and told him they got them "way up the Coast"; defendant wanted to take the tools to his girl friend's house; they took the tools there, and then they and defendant argued about the price; he bought everything they had stolen from said automobile company; defendant said that he had quite a few tools but he would still take tires, that, since Christmas was near, if they could get some watches and things of that sort he could get rid of them easily; they said they would look around. He testified further that on October 22, 1952, at 9:30 p.m., he, Bell and one Henke broke into and entered a jewelry store in Pismo Beach, and took therefrom watches and rings, including about 50 watches that were there for repairs; then that same evening, they took those things to Clisby's garage in Los Angeles and there they sold three or four watches to different persons; defendant came there and told them to bring the things to his house so that he could look at them; they took all the things, except the three or four watches they had sold, to his house; they told him they wanted $1,000 for all the jewelry; he said that was too high; the next evening they took 20 watches and some rings to his house; the other jewelry was left in a locker at the garage; the ring cases had the words "Pismo Beach" on them; defendant said "I see this came from Pismo Beach"; they said that he should not worry about it—"we got away clean, nobody saw us"; defendant bought the watches for $10 each; later that evening Ward, Bell and Henke (the burglars) had an argument and Ward "split up with them" and left them, and they took the remainder of the stolen jewelry. He testified further than on October 28, 1952, about midnight, he and Brush broke into and entered a building in Huntington Beach, which was occupied by an automobile company, and took therefrom six tires, tools, a valve grinder, an adding machine and a typewriter; the next day they took all the said stolen articles to defendant's house, and told him that they got the articles outside Los Angeles County; he bought some of the tools; the next day he bought the adding machine and typewriter for $50. He also testified that the ages of himself, Brush, Bell and Henke, respectively, were: 20, 22, 19, and 19 years.

Defendant testified that in recent years he had engaged in buying wrecked cars; he had accumulated tools during the past two or three years; he first stored the property on

Central Avenue, and then he moved it to the basement of his home; one day in September or October, 1952, at Clisby's garage, which is a hangout place for mechanics, Brush asked him if he would be interested in buying some tools—he had a friend who was selling a garage; about two weeks later Brush and Ward were at the garage with tools in Ward's car; he looked at the tools there, then they went to his house and he bought the tools for $210 and put them in the basement; Brush said that he would bring more tools from his friend who was selling a garage; defendant said he would buy the tools; about four weeks later Brush and Ward were at Clisby's garage with more tools in the back of a car; they went to defendant's home and he bought the tools for $150; he bought tools and tires from them on another occasion and paid them $70; one evening when he went to Clisby's garage Ward and Bell were there selling watches for $10 each; the watches were in a big container and people were coming in from both sides of the street and buying watches; Bell said that he was tired of selling the watches one by one and he would like to make a deal on all the watches for $1,000; defendant offered him $350 or $400 for them but the offer was not accepted; some of the watches were new and some were used; about 9:30 p. m. of that day they came to his house and he bought 18 or 20 watches and two rings for $200; the next day he bought 15 or 18 more watches from Bell for $200; Bell gave defendant about 25 used watches which he (Bell) could not sell; he also left with defendant, for safekeeping, a suitcase with watches in it; defendant put the suitcase in the basement but he never opened it; defendant left three watches with Mr. Chastain for repair; he had forgotten that he had taken the watches there; he gave Bell and Ward $50 for an adding machine and a typewriter with the understanding that they could redeem them, but they never returned to get them; he told a police officer that a ring that he (defendant) had on his finger was a ring he received when he was graduated from Lincoln High School, but he had "lied" when he said that; he told the officers that he did not know that the property had been stolen and that he had no idea that it was stolen property.

The evidence established that the property which appellant bought from Brush, Ward and Bell was stolen property. The principal question of fact before the trial court was whether appellant knew that it was stolen property.

Appellant contends that Ward was an accomplice of ap-

pellant, that the testimony of the accomplice was not corroborated as required by section 1111 of the Penal Code, and therefore the evidence was insufficient to support the convictions. He argues that the evidence shows a conspiracy between appellant and Ward wherein there was a preconceived plan that Ward and his associates would steal certain property and sell it to appellant, and that under such circumstances the thief is an accomplice. ▆ The general rule is that the thief and the receiver of stolen property are not accomplices, but an exception to that rule is that where the thief and the receiver conspire together in a prearranged plan for one to steal and deliver the property to the other, the thief is an accomplice. (*People* v. *Lima,* 25 Cal.2d 573, 576, 577, 578 [154 P.2d 698].) In that case the defendant operated an olive crushing plant where he purchased olives from which he made olive oil. It was claimed therein that he knowingly purchased olives that had been stolen by two prosecution witnesses from nearby orchards. He denied that he had purchased the stolen olives, and those olives were never seen at his plant. It was held therein that said two prosecution witnesses were accomplices, that there was no evidence other than that of the accomplices tending to connect the defendant with receiving the stolen olives, and because of the total absence of evidence corroborative of the testimony of the accomplices the evidence was insufficient to support the conviction. ▆ In the present case the testimony of Ward was corroborated. Stolen goods, consisting of heavy machinery, several boxes of various kinds of tools, dozens of new and used watches, some rings and diamonds, an adding machine and a typewriter, of the value of approximately $6,000 were found in appellant's home. He paid about $700 for all the property. He made evasive and false answers to officers' questions regarding the property. When he was on the front porch and about to enter his house, he saw a friend of his and a police officer in the house "handcuffed together," and at that time he dropped the satchel of watches on the porch. When officers directed his attention to the many watches and jewelry in his house, he said it was junk jewelry—old stuff he had accumulated over a long time. When the officer asked about the satchel with jewelry in it (which appellant had dropped on the porch a few minutes previously), appellant said he did not know what the officer was talking about. He admitted that he "lied" when he told the officers that the stolen ring he was wearing was a gradua-

tion gift. When he was confronted with the machinery and the tools in the basement (which had been stolen a few weeks previously) he said that he had had everything for two years and he did not get anything after he started to work for Lockheed in March. The possession of the goods, and the evasive, contradictory and false answers of appellant strongly corroborated the testimony of Ward.

Appellant asserts further that the court erred prejudicially in refusing to give instructions, requested by appellant, to the effect that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. ▇ It was error to refuse to give such an instruction, but in view of the strong corroborative evidence the error was not prejudicial. In *People* v. *Coakley,* 108 Cal.App.2d 223 [238 P.2d 633], the court said, in referring to the failure to give such an instruction (p. 228): ''There was abundant corroboration aside from the Reyes' testimony to connect appellants with the crime charged. The articles stolen . . . were found in appellants' apartment. Access to the typewriter was made difficult by their placing it in the attic. . . . Neither appellant denied they had possession of the stolen property. Possession itself was sufficient corroboration. . . . In addition to the possession of the stolen articles and the confession of appellants, they are now confronted by the falsehoods they told the officers in their efforts to exculpate themselves . . . Such contradictions by one accused, or his silence or his lies are independent corroborative evidence. [Citations.] In view of such strong corroboration it is a reasonable deduction that the refusal of the court to give the requested instructions was not prejudicial.''

Appellant also asserts that the court erred in sustaining an objection to questions, asked appellant, as to the value of certain automotive equipment and tools. He argues that the People had introduced evidence as to the inadequacy of the price he had paid for those things, and that he should have been permitted to introduce evidence that the price he paid was similar to the market value of the goods. He had testified that during a period of approximately three and one-half years he worked with some fellows who were in the business of buying wrecked cars; he had not ''exactly bought any equipment,'' but he would buy cars on the street which had tools in them; during said time he purchased automotive equipment and tools and he became ''somewhat'' familiar with

the costs, on the used market, of that type of merchandise. The question was: "What was the value of the property you purchased at the second transaction [with the burglars— the tools taken in Santa Monica]?" The objection was made upon the ground that no foundation was laid for the opinion of the witness. It was within the discretion of the court to determine whether the evidence was sufficient to show that he was qualified as an expert to give such an opinion. He was not the owner of the property. The People had not presented any evidence as to the value of the things stolen in said second transaction. Also it was not indicated what the answer would have been, and it cannot be said that the answer would have tended to prove adequacy of price paid for the stolen goods. It was not error to sustain the objection.

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.