UNITED STATES, Appellee

v

STOBO C. WEST, Acting Sergeant, U. S. Marine Corps, Appellant

12 USCMA 670, 31 CMR 256

No. 15,437

March 2, 1962

*Robert E. Hannon, Esquire,* and *Lieutenant Colonel J. E. Stauffer,* USMC, argued the cause for Appellant, Accused.

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Martin Drobac,* USNR.

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of conspiracy, absence without leave, offering violence to a superior officer, escape from custody, resisting apprehension, wrongful sale of Government property, larceny, and aggravated assault, in violation, respectively, of Uniform Code of Military Justice, Articles 81, 86, 90, 95, 108, 121, and 128, 10 USC §§ 881, 886, 890, 895, 908, 921, and 928. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, reduction, and confinement at hard labor for eight years. The convening authority modified one of the findings of guilty and reduced the confinement portion of the sentence to five years. With one member dissenting, the board of review affirmed but found only four years of confinement, together with the other penalties adjudged, appropriate. We granted accused's petition for review upon numerous assignments of error. It is, however, necessary only to discuss the contention that:

"The accused was denied the right to a fair and impartial trial."

**671**

The evidence adduced at the trial tends to establish that the accused, together with other Marines and Native Okinawans, took advantage of the deplorable lack of security measures at his station to engage in large scale thefts and sales of Government property. In January 1961, he apparently became aware of a tendency on the part of one of his fellow conspirators to talk to others about their criminal activities. In order to impress a need for silence upon this Marine—one Corporal Breslin—accused and another sergeant subjected him to a severe beating. Breslin's need for medical attention led to exposure of the entire ring.

On January 25, 1961, accused was confined to the station brig. There, he was placed in what the United States euphemistically describes as "segregation." His accommodations consisted of a cell five feet wide, seven feet long, six and one-half feet in height, known colloquially as the "box." The walls and floor were of solid concrete. The door was of solid steel construction. Two small hooded ventilators served to admit air. There was no light and no furniture. Accused was provided with four blankets and received three full meals daily. These were delivered to him cold and he was required to eat in the dark with a spoon. He was not allowed to lie down between reveille and retreat, and his sole infraction of brig regulations consisted of being found asleep on the cell floor during daylight hours by the medical officer to whom he was "disrespectful" by failing promptly, and in accordance with confinement rules, to come to attention with his toes against a painted yellow line. He was not punished for this "offense," as the sole additional penalty which could have been imposed was reduction of his diet. The latter constituted the only distinction between accused's solitary confinement and that imposed upon other prisoners as a purely punitive measure.

West remained in solitary confinement from January 25 until January 28. On the latter date, he was transferred to an Army hospital for treatment of *delirium tremens*. He was returned to the brig and confined again in the "box" on February 3. On the following day, he was released from confinement to assist criminal investigators in apprehending his Okinawan co-conspirators. He remained free of restraint until February 22. On that day, he absented himself without authority. On March 6, he was apprehended and again placed in the "box." On April 8, while outside the brig in the custody of a unit guard, he escaped. He was recaptured a few hours later and returned to the "box." West remained there until April 22, on which date he was released from "segregation" upon the complaint of his individual defense counsel. He, however, remained confined in the brig until transferred to the Joint Services Stockade on July 7, 1961.

Accused's trial commenced on July 12, 1961. He was driven to and from the court in a box mounted on the rear of a truck and, surrounded by guards, was required to change clothing in a position easily visible to the court members. At the commencement of the trial, five guards armed with shotguns were also permitted to patrol the courtroom. For the first three days of the trial, accused was required to appear in a prisoner's uniform marked with yellow paint. From the fourth day onward, he was permitted to dress in utility clothing. He was not allowed to shave before attending court. At the commencement of the proceedings, individual defense counsel brought the foregoing matters to the law officer's attention. He ruled that the security arrangements would be modified in order to make the guards and truck less conspicuous. He also ordered that the trial counsel take appropriate action to see that the accused was allowed to shave and to wear an appropriate uniform and those decorations to which he might be entitled. Repetition of the defense request for relief apparently resulted, as noted above, in accused's appearance, still unshaven, in fatigues on the fourth day of the trial.

It is also worthy of note the trial counsel declared that he had contacted accused's commanding officer four times with respect to West's appearance but nothing had been done. Trial counsel

also stated, with respect to the original security measures, that, "I dislike the atmosphere as it affects, or I should say what is going on here as it affects the judicial atmosphere." Nevertheless, it appears that the court members were still permitted to view the accused, with his "army of guards" being unloaded from and loaded into his vehicular "box" throughout the trial.

The appellate defense counsel urges upon us the contention that the foregoing security measures, deprivation of proper uniform and accessories, and the pretrial confinement were tactics in which the accused's superiors deliberately engaged in order to present him to the court-martial, from the hour of its assembly, as a desperate criminal deserving of severe punishment. The Government responds with the hollow argument that accused's remedy was to prefer charges under Code, supra, Article 98, 10 USC § 898, and that, in any event, he suffered no prejudice from the circumstances of his pretrial detention or his appearance in court.

Although we find it strange that neither the brig officer, the provost marshal, nor the criminal investigators who testified were able to state the source of authority or motivation for accused's solitary confinement prior to his eventual escape from custody, we are reluctant on the basis of this jumbled record specifically to impute to the convening authority or his subordinates a designed attempt to strip West of rights so clearly secured to him under the Uniform Code of Military Justice. That we hestitate exactly to place responsibility does not mean we are not clearly aware of the pernicious result of these measures, for we are certain they designedly operated to deprive the accused of the fair and impartial hearing to which he was entitled.

The first factor which leads us to this conclusion is accused's solitary confinement. Aside from any ▮▮▮▮▮▮▮ coercive effect it may have had with respect to his pretrial statements and cooperation with criminal investigators, it is chiefly important as a framework adding depth and color to subsequent events transpiring in connection with the actual trial. The equivocal and evasive testimony of those charged with his safekeeping clearly establishes that security and discipline played little if any part in the decision to place him in the darkened "box." And deprivation of furniture, bedding, reading material, hot meals, and illumination smack strongly of punishment. Indeed, the brig officer testified that the only additional punitive measure available in the facility was reduction of diet. It appears, therefore, necessary forcibly to call attention to our decision in United States v Bayhand, 6 USCMA 762, 21 CMR 84. Therein, we stated, at page 768:

"From the foregoing, the conclusion is inescapable that Congress, the framers of the Manuals for Courts-Martial, and the Army must have recognized that gross injustices might result from any confinement system in which one accused of crime was treated no better than one proved guilty. *Therefore, to eliminate any and all forms of punishment prior to trial, except that which is inherent in all confinement, laws and regulations were enacted to protect the untried confinee.* It must be remembered that the only valid ground for ordering confinement prior to trial is to insure the continued presence of the accused, as where he has earlier indicated that his obligation to remain with his unit weighs lightly with him, or where the seriousness of the offense alleged is likely to tempt him to take leave of his surroundings." [Emphasis supplied.]

If an accused should not be confined except upon these "valid grounds," then *a fortiori*, the limitation upon his freedom of action should not extend to punishment which is not only unauthorized but, indeed, forbidden to be adjudged by courts-martial. United States v Stiles, 9 USCMA 384, 26 CMR 164. Cf. Code, supra, Articles 13, 15, 10 USC §§ 813, 815, and United States v Williams, 10 USCMA 615, 28 CMR 181.

Passing to the trial, we come directly to grips with the question whether accused received a fair hearing. At the outset, it is apparent once again that unusual security measures were taken at the court-martial. We have no disposition to argue with the occasional need for special restraints to insure against the possible escape of an accused or to prevent violent conduct on his part. Indeed, the circumstances may dictate that he be shackled or that a sufficient number of guards be provided in or out of the courtroom. United States v Henderson, 11 USCMA 556, 563, 29 CMR 372, 379; United States v Payne, 12 USCMA 455, 462, 31 CMR 41, 48, The issue is one ultimately to be resolved by the law officer in the exercise of a sound discretion. While he acted here and directed that the guards be made more inconspicuous and that accused's entry and departure from the scene of the trial take place less obviously, it does not appear that his order was wholly followed. Rather, it would seem that those responsible for accused's security continued to surround him with guards and caused him to dress and undress in the presence of the court members. At no time was any instruction given to the court-martial with respect to disregarding these actions in connection with their deliberations. See United States v Payne, supra. Moreover, we are impressed by the effect which the guards and prison transport admittedly had upon the trial counsel in connection with the atmosphere in which the court-martial was conducted. Recognizing that the law officer sought to correct the situation, we are forced to conclude that his orders were rendered ineffective by the failure fully to comply with their terms. Accordingly, we believe that more than a fair risk exists that the security measures here employed contributed in no small part to depriving accused of an opportunity to be heard impartially.

Finally, we turn to the apparent refusal of accused's commanding officer to provide him with a proper uniform and to see that he had the opportunity to appear before the court-martial neatly dressed and groomed. The staff legal officer's post-trial review characterized this lack of compliance with the law officer's instructions as "difficult to understand" and "most improper." We agree with his comments but are unable to join in the conclusion that accused was not thereby prejudiced.

The Manual for Courts-Martial, United States, 1951, explicitly provides, at page 84:

> "The convening authority, the ship or station commander, or other proper officer in whose custody or command the accused is at the time of trial is responsible for the attendance of the accused before the court. *The accused will be properly attired in the class of dress or uniform prescribed by the president for the court. An accused officer, warrant officer, or enlisted person will wear the insignia of his rank or grade and may wear any decorations, emblems, or ribbons to which he is entitled."* [Emphasis supplied.]

The purpose of the foregoing provision is plain. It enables an accused to present himself physically as an innocent and decent member of military society until the court-martial has found to the contrary and sentenced him. It does not require citation of authority to note the difference in the impression made upon the court members by a clean-shaven, well-dressed young Marine, wearing his decorations and the insignia of his grade, and that created by a whiskery defendant clad in an ill-pressed prison garment decorated only with splotches of yellow paint. We have heretofore emphasized the importance of evidence of an accused's good military character. United States v Browning, 1 USCMA 599, 5 CMR 27; United States v Gagnon, 5 USCMA 619, 18 CMR 243. His appearance before the court-martial in a respectable condition is but another facet of this rule.

Viewed in the light of the other matters disclosed in this record and dis-

cussed, supra, we cannot avoid the belief that denial of appropriate uniforms and grooming served to cap the presentation of Sergeant West to the members of the court-martial as a dangerous individual whose guilt had been previously established and concerning whom a hearing was no more than a formality. In light of these circumstances, we are certain that the deprivation operated to his material prejudice and contributed to the denial to him of a fair and impartial trial.

Prior to disposing of this matter, we believe it important to emphasize what we do not decide. We are not here concerned with "second-guessing" appropriate service officials concerning whether the "security" measures employed at the trial or during pretrial confinement were necessary in light of the accused's behavior or reputation. What we do decide is that, although an issue was raised and witnesses were called, there was no showing in the record of the need for these steps. To the contrary, the testimony of the accused, the brig officer, and the provost marshal, as well as the comments of the trial counsel, indicate they had no basis in law or fact. Moreover, only the most unusual circumstances would justify placing an accused under the strictures here depicted. Indeed, we are at a loss to state precisely what they would be. In almost eleven years of administration of military justice under the Uniform Code of Military Justice, we have not seen the like of this case before, and it bears the unmistakable indicia of a return in one jurisdiction to those practices which led to the Code's enactment. We are confident that appropriate measures will be taken in the future to insure that the record before us remains unique in the annals of military law.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be held.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

Unlike my brothers, I think the circumstances of the separate periods of accused's incarceration require separate consideration. And, when so considered, the picture is not pernicious. The so-called "box" or segregation cell was the only confinement structure in the Camp Butler brig compound which provided some measure of security; all the other structures were merely tents from which anyone could get out "if he want[ed] to . . . badly enough." The nature of the offense for which the accused was ordered into confinement justified his assignment to a secure unit in the brig. He and a companion took Corporal Breslin for "a ride" and brutally assaulted him because they feared Breslin talked too freely to his girl friend about their participation in the systematic larceny of Government property for sale on the blackmarket. Among the injuries inflicted upon Breslin were three fractured ribs. During his confinement the accused was visited daily by a medical officer; he was allowed to shower and to visit the "head"; he was permitted to exercise fifteen to twenty minutes a day; and, if he wanted it, a Bible was available to him for reading. On the third day, the accused, who admitted he customarily drank a fifth of whiskey a day, exhibited symptoms associated with withdrawal of alcohol from a heavy drinker. Consequently, he was transferred to the hospital. Nothing in the record shows that he was treated other than as an ordinary patient. On his discharge from the hospital, he was released from confinement and returned to his own organization. Then, he absented himself without authority. Manifestly, the circumstances of the first period of confinement do not, as my brothers say, "smack strongly of punishment."

Justification for close confinement also appears in regard to the other periods of confinement. Parenthetically, it is worth noting that while the confinement was in a maximum security cell of the brig compound, it was so loose as to make it, as the accused admitted, "easy" to receive communications and contraband from friends on

**675**

the outside resulting in putting the brig "under investigation." However, treating all the periods of confinement as one, and assuming the conditions of confinement were unnecessarily severe, it is still crystal clear that the total incarceration did not coerce, compel, or influence the accused to incriminate himself by word or deed. On the contrary, it rather compellingly appears that even the accused's later escape from custody was not engendered by the emotional and physical stresses of the form of his confinement, but actually to further his private ends. Finally, there is not the slightest evidence to indicate the confinement hindered or in any way impaired the accused's defense efforts. Unquestionably, therefore, the pretrial confinement did not deprive the accused of a fair trial on the merits.

Similarly, the picture painted in the principal opinion of an unshaven, ill-clad, and closely guarded accused uses colors too vivid to fit the accused and too light to portray the background. As to the security guards, the law officer acted forthrightly and effectively to limit the number in the courtroom and to remove from the sight of the court members the truck used to transport the accused. At this point it should be emphasized that the prison officials testified they had substantial reason to believe the accused would attempt an escape. In any event, the law officer ruled that he was responsible for determining the security measures in the courtroom, "Objection of the Provost Marshal or any other person in the executive chain . . . notwithstanding." It convincingly appears that he reduced the problem of the security guards to an inconsequential and transitory incident in the trial proceedings. As to the shaving complaint, there was no mention of the matter until the fourth day of trial. At that time, defense counsel complained, in the course of an argument on the motion for a mistrial, which was directed principally to a restatement of the previous complaint of pretrial confinement and to a ruling by the law officer permitting the prosecution to introduce further testimony to establish the admissibility of certain evidence, that the accused "is not permitted to shave in the morning so he usually arrives here . . . unshaven." As far as we know, however, the accused might very well have been allowed to shave during the time prescribed for all prisoners, but refused to do so.

There are many other details which change the character of the picture portrayed in the principal opinion, but I have set out enough to show my conviction that these matters did not deprive the accused of a fair trial. As to the findings, there is only one charge, desertion, that raised a substantial issue. The court-martial convicted the accused only of the lesser offense of unauthorized absence. It also made exceptions and substitution in some of the other charges. It is obvious, therefore, that the court-martial gave careful attention to the evidence, not to the accused's uniform and unshaven face. As to the sentence, the maximum authorized confinement for the offenses found was sixty-two and one-half years; but the court-martial imposed a sentence that included confinement for only eight years. Considering the nature and the number of the offenses and the permissible period of punishment, the adjudged sentence is itself a strong refutation of the claim of a risk of prejudice resulting from the accused's slovenly physical appearance before the court-martial. I find no reasonable basis in this record of trial to support the claim of denial of a fair trial.

I have examined carefully all the other assignments of error and I find no prejudice to the accused in any of them. Only one merits further mention. It is a contention that the accused's testimony before a civilian court, which was admitted in evidence against him, was obtained in violation of Article 31 of the Uniform Code of Military Justice, 10 USC § 831. This assignment of error is based on the fact that the accused appeared as a witness in a civilian court that tried some of his Okinawan accomplices. At this trial he was not advised of his rights under Article 31. There is, however, no evidence to indicate that the accused

was induced or coerced to testify before the civilian court. On the contrary, the board of review below found that the accused was specifically advised he could not be made to testify before that court. Under the circumstances the accused's testimony was clearly voluntary, and, therefore, admissible against him. In a substantially similar situation in United States v Howard, 5 USCMA 186, 197, 17 CMR 186, I said:

"... From the record, it appears that the accused was actually aware of the privilege against self-incrimination. Before he appeared as a witness at the guard's trial, the accused was interviewed by an officer investigating the offense then pending against him. In that interview, the investigating officer read and explained Article 31 to him. Under the circumstances, the accused waived his right when he did not claim it at the time he testified as a witness."

I would affirm the decision of the board of review.