UNITED STATES, Appellee

v

CHARLES L. SCOLES, Private First Class, U. S. Army, Appellant

14 USCMA 14, 33 CMR 226

No. 16,477

May 10, 1963

*Captain Bruce C. Johnson* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod, Captain Charles W. Schiesser,* and *Captain Thomas Stapleton.*

*First Lieutenant Robert E. Shepherd, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

### Opinion of the Court

FERGUSON, Judge:

This record presents a shocking example of how a general court-martial should *not* be tried. Its pages are filled

with petty bickering between counsel, each side seemingly more intent upon scoring on the opposing attorney than in attending to its task of insuring that justice is done fairly and impartially in surroundings characterized with the dignity and decorum befitting the seriousness of the proceedings. We remind law officers of their authority—nay, duty—to require military and civilian counsel to conduct themselves in a manner befitting their profession and the courts before which they practice. Cf. United States v Cole, 12 USCMA 430, 434, 31 CMR 16, 20.

Accused was arraigned and tried upon four specifications of larceny of gasoline, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, five specifications of wrongful appropriation of motor vehicles, in violation of the same Article, and five specifications of wrongful sale of military property, in violation of Code, supra, Article 108, 10 USC § 908. The law officer granted a motion for a finding of not guilty as to three of the specifications. The court-martial acquitted accused of an additional count, but convicted him of the remaining charges. It sentenced him to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for nine years, and reduction. The convening authority set aside the findings of guilty as to four of the specifications and reduced the adjudged term of confinement to six years. The board of review affirmed the remaining findings of guilty and so much of the sentence as provides for dishonorable discharge, total forfeitures, reduction, and confinement at hard labor for three years. The accused now stands so sentenced on the basis of findings of guilty of two specifications of larceny, one specification of wrongful appropriation, and three specifications of wrongful sale of military property. We granted his petition for review on issues dealing with the requirement that he appear at the trial in fatigue uniform and the law officer's instructions regarding the testimony of his alleged accomplices.

Basically, the evidence tends to establish that Scoles, one Fortney, and other soldiers assigned to the 24th Quartermaster Company surreptitiously obtained gasoline from military sources and sold it to various German nationals living in the vicinity of Dachau, Germany. The stolen gasoline was conveyed to its eventual purchasers by means of wrongfully appropriated Army tank trucks.

All parties to the trial concede—and we think, advisedly so—that the real issue before the court-martial was whether accused could be identified as one of the group of soldiers who actually stole and sold the gasoline in question. The various German purchasers were unable to identify him at the pretrial investigation as having been present during the several deliveries of fuel. At the trial, they pointed out the accused as one of the culprits but indicated some uncertainty concerning the matter. During their pretrial interviews with the trial counsel, it appears they were shown a photograph of Scoles, dressed in fatigues and wearing his name tag. Each witness also indicated that the soldiers from whom the gasoline had been purchased were, at the time, dressed in fatigues.

Private James A. Fortney testified for the prosecution and unequivocally identified the accused as having participated in the theft, delivery, and sale of the gasoline. Fortney declared that he was one of accused's accomplices in these fuel transactions, and had previously pleaded guilty pursuant to an arrangement with the convening authority, under which the latter would approve no sentence in excess of dishonorable discharge, total forfeitures, and confinement at hard labor for nine years. In addition, Fortney was to receive "one year off for every man I testified against." The details of this agreement were aired on cross-examination after Fortney had testified on direct that he had been offered nothing "to testify in this court today . . . no promises of any reduction in . . . sentence or anything of that nature."

I

At the outset of the trial, it was disclosed the trial counsel had requested the president of the court-martial to

order it convened in fatigue uniforms. The president did not "know of any" other court so convened. Defense counsel made known to the law officer that a prior request to have accused afforded the opportunity to appear in "Class A" (the ordinary and usual uniform) had been denied. Over counsel's objection to requiring accused to appear in fatigues, the trial proceeded. However, at counsel's request, Scoles was permitted to wear the jacket of another soldier, bearing that individual's name tag, and to sit among similarly clad spectators during the attempts of the German witnesses to identify him.

Under the circumstances of this case, we believe that the action of the law officer in overruling the defense objection and requiring the accused to appear in a fatigue uniform was reversible error. Undoubtedly, as the Government notes, the Manual for Courts-Martial, United States, 1951, provides, in paragraph 40*b* (1), that the "president of a general court-martial . . . [a]fter consultation with the trial counsel and, when appropriate, the law officer . . . sets the time and place of trial and prescribes the uniform to be worn." Cf. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 161. But that authority cannot be misused or perverted in order to ease the path of the prosecutor.

A similar contention was pressed upon us in United States v Acfalle, 12 USCMA 465, 31 CMR 51. There, accused's leave orders were revoked, and he was placed on temporary duty at another installation at which, among other things, he was isolated from all contacts with friends and relatives. Of such use of the power of an armed service to transfer an individual, we said, at page 469:

". . . While the United States Air Force is clearly authorized to issue orders revoking an enlisted man's leave and placing him on temporary duty at another installation, *it may not perversely use this authority as a coercive instrument for the purpose of removing him to a location at which he is effectively isolated and likely to succumb to police pressures."* [Emphasis supplied.]

So, too, while the Manual, supra, may provide that the president of a general court-martial shall prescribe the uniform of the court, that authority may not be cleverly utilized by the trial counsel as a weapon to render less onerous the burden of identifying the accused as one of the guilty parties in this maze of illegal transactions.

That such is the case here is undisputed in the record. The president was personally asked by the trial counsel to order the court-martial convened in fatigue uniforms. Although a senior officer of long experience, the president was unaware of any other court-martial which had appeared in that garb. As the court-martial was convened and sat at Flak Kaserne, Augsburg, Germany, the case was obviously not tried under field conditions necessitating resort to the clothing utilized. When these facts are coupled with the failure of German witnesses before the trial to identify accused, their testimony that he was clad in fatigues while dealing with them, and their uncertain identification at the trial, it becomes obvious that trial counsel sought the president's cooperation solely to make certain that all conditions in the courtroom were favorable to producing a sustainable case against the accused. We simply will not tolerate such misuse of military authority in order to gain a desired end. United States v Acfalle, supra.

Moreover, we point to the fact that accused's request to appear before the court in "Class A" was denied. In United States v West, 12 USCMA 670, 31 CMR 256, we discussed the right of a defendant to present himself before a military tribunal so attired as to make the most favorable impression upon the court through display of such decorations, emblems, or ribbons as he might be entitled to wear. This, we said, was "but another facet" of the rule permitting an accused to use his good military character to persuade the fact finders of his innocence. United States v West, supra, at page 674.

**17**

True it may be that he must appear in the uniform prescribed by the president, but when that uniform, absent military necessity, is one on which he may not display any decorations, ribbons, or emblems, and he is so clothed at the instance of the prosecutor, it is clear that the president's authority has been abusively exercised.

It seems so unnecessary to resort to the sharp practice here employed by the Government to assist its case. Under our system of law, means are quite as important as ends, and the name of the Republic should not be soiled at the hands of one charged with enforcing its laws. This was, as Mr. Justice Holmes said in Olmstead v United States, 277 US 438, 72 L ed 944, 953, 48 S Ct 564, 575 (1928), "dirty business," to be vigorously condemned by everyone involved in military justice administration.

One final matter bears mention in connection with the subject before us. Courts-martial are, and have always been, judicial proceedings. They should be conducted as such. We believe that, except in unusual circumstances, they should be convened with the members, counsel, law officer, and accused appearing in dress suitable to the occasion. One need hark back only briefly in military history to recall the assembly of a general court-martial with its participants clothed in their finest raiment and armed—perhaps symbolically—with dress swords. The use of fatigue uniforms detracts from the dignity of the court, and, while time marches on and the sword has largely disappeared, we dare suggest that some attention to tradition will add much to the awe and respect which should surround every court-martial as a part of the military judicial system.

## II

While the foregoing consideration requires a rehearing, we turn, in order to eliminate further difficulty at another trial, to the issue regarding the law officer's instructions.

At the conclusion of the trial, the law officer agreed to, and did, advise the court-martial that Private Fortney was known in law as an accomplice and "unless the testimony of an accomplice is corroborated in important and material matters vital to the issues in this case, it is of doubtful integrity and is to be considered with great caution." However, despite the contrary request of defense counsel, he refused so to charge the court concerning the German witnesses who had knowingly purchased Army gasoline from the accused.

Before us, the Government argues essentially that the Germans were not accomplices, as they were not subject to military law and there was no showing they had committed an offense under German law. The rule is not so narrowly drawn.

In United States v Bey, 4 USCMA 665, 16 CMR 239, this Court adverted at length to the definition of an "accomplice" set forth in Egan v United States, 287 Fed 958 (CA DC Cir) (1923). In the latter case, it was held prejudicially erroneous to refuse an instruction on accomplice testimony, the court declaring, at page 965:

"Wherever two or more persons engage in the commission of a crime, each will be held guilty to the extent of his participation. This is true, whether they may be prosecuted under the same statute or different statutes. *In all such cases, where two or more persons cooperate in the commission of crime, or two or more are essential to the commission of a crime, as in the present case, they are accomplices, and it is error for the court to refuse to charge the jury that the testimony of one against the other, because of its self-incriminating character, must be closely scrutinized and received with great care and caution."* [Emphasis supplied.]

See also United States v Allums, 5 USCMA 435, 18 CMR 59, and People v Kupperschmidt, 237 NY 463, 143 NE 256, 32 ALR 447 (1924).

There is no universally accepted definition of the term "accomplice." The courts have accorded to it meanings extending from all persons who participate in the commission of a crime to an associate who knowingly

and voluntarily cooperates, aids, or assists in its commission. See, generally, 14 Am Jur, Criminal Law, § 109. As used in connection with instructions on the consideration of an accomplice's testimony, the term should, as indicated in United States v Bey, supra, and Egan v United States, supra, be read broadly. The purpose of the advice is to call the court members' attention to a matter specifically affecting the witness' credibility, *i.e.*, his motive to falsify his testimony in whole or in part. Such is the teaching of history for, as noted in Phelps v United States, 252 F2d 49 (CA 5th Cir) (1958), at page 52:

"A skeptical approach to accomplice testimony is a mark of the fair administration of justice. From Crown political prosecutions, and before, to recent prison camp inquisitions, a long history of human frailty and governmental overreaching for conviction justifies distrust in accomplice testimony. Cobham's misplaced hope for immunity that helped send Raleigh to the Tower is on the same level with the hope of some narcotic peddler or some other poor wretch to save *his* skin by laying the entire blame on a friend or close associate."

Compare Guthrie v Commonwealth, 171 Va 461, 198 SE 481 (1938), in which it was declared, at page 482:

"The present rule applicable to the testimony of an accomplice originated in the ancient doctrine of 'approvement'; that is, where a person indicted for treason or any other felony confessed the fact before pleading, and, for the purpose of obtaining his own freedom, made accusation against others, his accomplices in the commission of the crime. If the persons implicated were convicted, the 'approver' received his pardon; if they were acquitted, the 'approver' was hanged. IV Blackstone Com. 330, 331; Whiskey Cases, 99 US 594, 599, 25 L Ed 399. Later, the English decisions dealt with the admissibility of the testimony of accomplices and not with the question of its weight.
"Out of the rule of complete immunity arose the dangerous possibility that an accomplice would falsely accuse others in order to avoid his own penalty. The credibility of such testimony was the subject of comment by the judge in the exercise of his common law function of advising the jury on the weight of all the evidence. This well-established rule of practice has become virtually the equivalent of a rule of law by which judges warn juries that it is dangerous to convict a person on such evidence when it is uncorroborated. Halsbury's Laws of England (2d Ed.), Vol. 9, p. 222."

Undoubtedly, as the Government argues, the German witnesses were not persons subject to the Uniform Code and, hence, could not be tried by court-martial for any of the crimes charged against Scoles. Nonetheless, it appears also that they were knowingly involved in the purchase of stolen Army gasoline, and trial counsel conceded that they at least "may have committed some offense under the German customs law." We believe, therefore, as to the sale of the gasoline, they were clearly accused's accomplices, for the temptation to clear their skirts with the German authorities by cooperation with the United States forces would be as much present as if they could have in fact been brought before a general court-martial. Phelps v United States, supra.

Moreover, it would place a most difficult burden on military law to limit the definition of an accomplice to situations in which the witness was either subject to the Code or triable under local law for the precise offense charged against the accused. The need for appropriate instructions would then vary from case to case according to the locale in which it was tried and the laws of various foreign jurisdictions. We think it infinitely more practical to apply the same principle to all trials and to hold that a witness is an accomplice if he was culpably involved in the crime with which accused was charged. United States v Bey; Egan v United States, both supra. Under this rule, the military jury will be properly informed of the witness'

self-interest and cautioned to consider it in weighing his credibility. We hold, therefore, that the German witnesses were accomplices to the sale of the gasoline and that the law officer erred prejudicially in failing to include them in his instructions on the matter.

### III

Having disposed of the issues before the Court, we are compelled by our duty in connection with the ad-■■■■■ ■ ministration of military justice to notice and condemn one further aspect of this trial. According to Private Fortney's testimony, his agreement with the convening authority included a provision for the reduction of his sentence by a period of one year for each occasion on which he testified against one of the other soldiers allegedly involved in the theft and sale of the gasoline. We believe such a contingency agreement to be contrary to public policy. It offers an almost irresistible temptation to a confessedly guilty party to testify falsely in order to escape the adjudged consequences of his own misconduct.

In Williamson v United States, 311 F2d 441 (CA 5th Cir) (1962), the Circuit Court of Appeals reversed defendant's conviction in light of the fact that he was delivered into the hands of Federal officers by an informer who, on the basis of a contingent fee arrangement, agreed to make purchases of illicit whiskey from one Williamson. We think peculiarly appropriate the language of Circuit Judge Brown in his concurring opinion, at page 445:

"For Government to offer a specific sum of money to convict a specified suspect is really more than civilized sensibilities can stand. But in condemning such conduct by the decisive weapon of a reversal, we ought to be aware that there may be equally offensive actions which are less spectacular.

• • • • •

"What we hold is that, recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough—it is just too much.

When that occurs, the law must condemn it as offensive whether the method used is refined or crude, subtle or spectacular."

In like manner, the contingency agreement here employed is fully as repugnant to civilized sensibilities. We have not seen its like before, and we trust resort to such terms will not be had again.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN concurs.

KILDAY, Judge (concurring in the result):

I concur in the result.

I agree that failure to instruct the court-martial that the German witnesses were accomplices constituted error prejudicial to the substantial rights of the appellant and requires a reversal of this case.

Should the majority opinion, however, be intended to hold that the receiver of stolen property is, in all instances, an accomplice, upon the trial of the thief, I disassociate myself from that holding.

There is a definite division of authority on this question. For a collation of authorities on each side of the matter, see 9 ALR 1397. In 32 ALR 449 there is an additional listing of authorities in various jurisdictions, both to the effect that such a witness is an accomplice and that he is not. In 111 ALR 1398 there is still another listing which indicates a continuing division of authority as to whether the thief is an accomplice of the receiver of stolen property, and vice versa.

To my knowledge, this Court has not as yet passed on this specific problem. I find a similar dearth of Federal authority on the general question presented.

In my opinion, there is no necessity for our deciding that question in this case. Appellate defense counsel, in their brief, point out that even in juris-

dictions in which it is held that the receiver is not an accomplice of the thief, an exception is recognized in those cases in which it is shown that a prior plan existed between the thief and the receiver. Counsel cite People v Davis, 124 Cal App 2d 173, 268 P2d 66 (1954); State v Slothower, 56 Mont 230, 182 Pac 270 (1919); and People v Malone, 167 Cal App 2d 400, 334 P2d 217 (1959). In addition, I refer the interested reader to the cases to the same effect collated in 111 ALR, supra, at page 1402.

The only Federal case which has come to my attention specifically involving the question of a thief being an accomplice of the receiver, or vice versa, is Stephenson v United States, 211 F2d 702 (CA 9th Cir) (1954). Therein, after observing the "general rule" is that the thief is not an accomplice of the receiver of stolen property, the court went on to state:

"To the general rule, however, there is increasing recognition of an exception to the effect that where the thief and the receiver of the stolen property enter into an agreement prior to the larceny for one to steal and the other to receive, the thief is an accomplice of the receiver and vice versa. Yeargain v State, 1935, 57 Okl Cr 136, 45 P 2d 1113; State v Keithley, 1928, 83 Mont 177, 271 P 449. The exception is based on the distinction between one who is an accessory both before and after the fact and one who is merely an accessory after the fact. The theory is that the previous arrangement between the thief and receiver amounts in effect to a conspiracy for both the theft and receipt of the stolen property. Under such circumstances the usual test for determining an accomplice is met since the thief and the receiver can be prosecuted for both the theft and receipt of stolen property. See, Aaronson v United States, 4 Cir, 1949, 175 F 2d 41."

The record in this case reveals that the German witnesses, as well as Fortney, were active participants in prearranged plans to steal gasoline on several occasions, and for the sale of the same. The Government's evidence was to the effect that appellant visited the home of one of the German witnesses on several occasions to make plans for the theft and purchase of gasoline. By prearrangement, German witnesses took their trucks containing empty drums to a prearranged spot to meet American soldiers and consummate the delivery of stolen gasoline. They participated in drawing gasoline from American military tank trucks. The deliveries were made at night in secluded areas, and the price paid for the gasoline was well below the current German market price.

In concurring in the reversal of this case, it is my view that the case comes within Stephenson v United States, supra, the only Federal decision of which I am aware on this question. I prefer to pretermit my decision as to which line of decisions this Court should follow on the general question as to whether, under different circumstances, a receiver is an accomplice of the thief, until such decision is necessary.

As to whether the German receivers were guilty of an offense under German law, I merely point out that the evidence clearly shows their guilt were they amenable to trial by court-martial. And, because the military judicial system is extraterritorial and world-wide in its application, a determination of the accomplice question must be uniform and independent of culpability under local law. See United States v Dial, 9 USCMA 700, 26 CMR 480; United States v Plante, 13 USCMA 266, 32 CMR 266. Cf. United States v Roark, 8 USCMA 279, 285, 24 CMR 89.

I, therefore, join in the holding of instructional error.

Turning to the other items considered by my associates, it is clear the atmosphere in which this trial was conducted falls far short of the decorum and impartial conduct which should permeate the trial of those charged with serious crime. Poor judgment is evident. However, I am not prepared to state the same constitutes unprofessional conduct or sharp practice.

Granted that the Manual for Courts-

**21**

Martial, United States, 1951, paragraph 40b (1) (a), permits the president of the court-martial to prescribe the uniform to be worn, such provision was never intended to give any advantage to either side. That rejection of the appellant's request to appear in Class A uniform, and direction that the court appear in fatigues, was of distinct advantage to the prosecution is manifest on the face of this record. That it so appeared to the law officer seems clear from his permitting the accused on trial to sit with the audience attired in a jacket bearing the name plate of another. The record indicates the law officer was a stranger to the post and had arrived that day. For aught that appears, he knew nothing of the reason for the unusual circumstance of a court convened in fatigues. At the early stages of the trial it became evident that at least a contention of unfair advantage was presented. The law officer would have been well advised to have suspended the trial for a sufficient period to have the court and the accused attired in accordance with custom and without danger of disadvantage to the accused.

I am not prepared to hold that this action constituted reversible error. Such holding is not necessary to our disposition of this case. We can confidently believe a similar indiscretion will not again transpire in this case. This Court is not in a position to supervise the uniform to be worn at individual trials. Neither does this case present the problems present in United States v West, 12 USCMA 670, 31 CMR 256.

The principal opinion discusses a third question, which was neither assigned at this level nor granted by this Court. It has to do with the terms of the pretrial agreement made with the witness, Private Fortney. This witness was an admitted thief. In addition, he was admittedly disloyal to his partners in crime. I do not endorse an agreement with such a character which places his cooperation on a contingent basis, such as one year off his sentence for each accused against whom he testifies. The wisdom of such a bargain is open to very serious question. However, some type of bargain is either expressed or implied in every deal with one who "turns state's evidence." In exchange for his testimony, he either goes free or receives a sentence less than he knows he deserves. Nevertheless, he remains a competent witness, as that term is known to the law. Fortney remains a competent witness and the Government carries the burden of establishing some credibility in him.

The principal opinion cites the case of Williamson v United States, 311 F2d 441 (CA 5th Cir) (1962). In that case, one judge of a three-judge panel—with one of the others concurring specially and the remaining judge dissenting—disapproved an agreement with an "undercover agent." There, the agent was employed under an agreement that he was to be paid a specified amount for "catching" a named individual violating the liquor laws. Conceding the lack of previous decisions involving a contingent fee agreement as to crimes not yet committed, the court refused to sustain a conviction resulting from the evidence of such agent. I point out that, among other distinctions, that case involved entrapment—not, as here, a completed crime as to which the witness incriminated himself and pleaded guilty. In view of the possibility of a rehearing, I feel it necessary that we indicate Private Fortney to be a competent witness.

Clearly, however, the law officer's instructional error requires that appellant's conviction be overturned. I, therefore, join in reversing the decision of the board of review.