UNITED STATES, Appellee

v

HERMAN EBARB, Airman Third Class, U. S. Air Force, Appellant

12 USCMA 715, 31 CMR 301

*Major Quincey W. Tucker, Jr.*, argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph E. Krysakowski*.

*Major James Taylor, Jr.*, argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker*.

## Opinion of the Court

FERGUSON, Judge:

Payday at Elmendorf Air Force Base, Alaska, occurred on December 31, 1960. Two airmen, Gerald Couch and Jerry H. McCoy, were temporarily absent from their unit and did not, therefore, appear to receive their checks. It was possible, however, for other airmen to pick up their checks for them. When they returned to duty, it was discovered that Treasury checks had in fact been issued for their respective salaries but had not been delivered to them. Subsequently, it was learned that the two checks had been cashed and returned to the Treasury through normal banking channels. Each bore the purported endorsement of the payee and that of the accused, the latter accompanied by his serial number.

Two voluntary pretrial statements were obtained from him, in which he admitted endorsing and cashing Couch's and McCoy's checks at the Alibi Club. He knew that "it was wrong to have signed McCoy's name to the check" and "did forge the payee's name" on Couch's check. In each instance, however, he stated that he had won both checks in a dice game held in the squadron barracks on the evening of December 31.

Accused was brought to trial before a general court-martial on charges of absence without leave, in violation of Uniform Code of Military Justice, Article 86, 10 USC § 886, and two specifications of forgery, in violation of Code, supra, Article 123, 10 USC § 923, the latter offenses being predicated upon the false making of Couch's and McCoy's signatures on the back of the two pay checks. He was found guilty and sentenced to bad-conduct discharge, forfeiture of $50.00 per month for 24 months, and confinement at hard labor for 24 months.

The convening authority reduced the amount of the adjudged forfeitures to $43.00 per month for twelve months and the term of the confinement to a like period. Otherwise, he approved the sentence. The board of review affirmed the findings and penalty. We granted review on contentions that:

"A. THE ACCUSED WAS PREJUDICED BY THE LAW OFFICER'S INSTRUCTION THAT '. . . The method of how (accused) came in possession of the checks in question in Specification 1 and Specification 2 of Charge II, has no bearing on the offenses charged. . . .'

"B. THE LAW OFFICER ERRED IN HIS FAILURE TO INSTRUCT ON THE DEFENSE OF ACCUSED'S HONEST BELIEF OF OWNERSHIP OF THE CHECKS WHICH FORM THE BASIS FOR THE SPECIFICATIONS OF CHARGE II, AND ENTITLEMENT TO THE PROCEEDS THEREOF."

At the trial, the Government introduced evidence establishing the matters set out above. The accused elected to appear as a witness in his own behalf and substantially reiterated the information contained in his pretrial statements. The only significant difference between his trial testimony and those admissions is his belated claim that he was intoxicated and hazy concerning whether he had actually endorsed the payees' names on the checks. He did not, however, deny that he had done so and declared that he seemed to recall such acts on his part. He again admitted that he knew it was "wrong" to endorse Couch's and McCoy's names

on the instruments, but did not think anything would come of it.

In his testimony, accused repeated his statement that he had obtained the checks in a gambling game and declared that he was not aware that the two payees had not been participating as players. As he had won the checks, he considered them to be his property and accordingly negotiated them.

We consider the foregoing testimony as well as accused's pretrial statements clearly to raise an ▆▆▆▆▆▆ ▆ issue of honest mistake with respect to the charged offenses of forgery. Code, supra, Article 123, punishes the false making of the signature of another to a writing which, if genuine, would apparently impose a legal liability on him or change his legal right or liability to his prejudice, provided such false making is done with an intent to defraud. United States v Taylor, 9 USCMA 596, 26 CMR 376. Indeed, the intent to defraud has been said to be "the essence of forgery." 23 Am Jur, Forgery, § 30.

There is undoubtedly a plenitude of evidence in this record from which the requisite state of mind on the part of the accused might be inferred. United States v Manuel, 3 USCMA 739, 14 CMR 157. But the sufficiency of the evidence to establish intent to defraud is not before us. Rather, the issue is whether there is some evidence in the record which would permit the court members reasonably to infer the lack of such intent on the basis that accused honestly believed he was entitled to the proceeds of the checks. United States v Coleman, 6 USCMA 773, 21 CMR 95; United States v Black, 12 USCMA 571, 31 CMR 157; United States v Moore, 12 USCMA 696, 31 CMR 282.

The situation presented in this case is, in some respects, similar to that before us in United States v Thompson, 12 USCMA 438, 31 CMR 24. There, the accused purchased chit books and charged them to a friend's account, signing the friend's name to the receipt for them. There was evidence tending to establish he had been permitted to do this before, and accused testified that, on the occasion in question, he believed he was authorized to do so. Of the situation, we said, at page 441:

"If the accused was in fact authorized by Watson, he certainly would not be defrauding him by signing his name for the books with the intention of paying Watson for the credit obtained. Certainly, too, the accused would not be deceiving the club. If the accused had authority to sign Watson's name, the credit would be actually extended to Watson, not the accused, and the amount would be within the limits prescribed by the club regulations for individuals of Watson's grade. Consequently, an honest belief by the accused that he had the requisite authority could negative the existence of the intent to defraud." [Emphasis supplied.]

In the record before us, both accused's pretrial statements and his in-court testimony reflect his insistence that he won the two checks in a gambling game; believed that they thereby became his property; and that he attached the false endorsements in order to obtain the proceeds. We have heretofore pointed out that a properly endorsed Treasury check has no "special value over and above the sum of money which it represents." United States v Epperson, 10 USCMA 582, 584, 28 CMR 148, 150. It would, therefore, logically follow that, if the accused won the checks, he actually was entitled to the sum which the instruments represented. Assuming his testimony to be true, it would seem totally inconsistent with an intent to defraud to state that he made the endorsements thereon, honestly believing that he was dealing with his own property. The situation is analogous to the defense of honest mistake in a larceny case in which an accused takes the property of another under the mistaken impression that he has a legal right to do so. Manual for Courts-Martial, United States, 1951, paragraph 200a.

The effect which we accord the accused's testimony and the similar declarations in his pretrial statements does not represent a novel doctrine. Ac-

cused's situation is remarkably similar to that in United States v Sonnenberg, 158 F2d 911 (CA 3d Cir) (1946), wherein the defendants were indicted for forging the endorsement of payees to certain Government checks issued as payment for the redemption of War Savings Bonds. From the evidence, it appeared that the defendants purchased the bonds from the actual owners at a discount. When he sold it, each owner signed his name to the "Request for Payment Form" attached to the bond. The redemption checks were obtained by the defendants in the payees' names. They endorsed such names on the reverse of the checks and cashed them. They had no express authority to do so.

In reversing and directing the entry of a judgment of acquittal, the Circuit Court of Appeals held that the sale of the bonds by their owners to the defendants "authorized the latter to do what was necessary to get the money out of the bonds which they had purchased." United States v Sonnenberg, supra, at page 915. See also Levinson v United States, 47 F2d 470 (CA 6th Cir) (1931).

We have carefully considered the Government's contention that the evidence herein does not raise an issue of mistake of fact. In effect, it attacks accused's credibility and relies upon his isolated assertions that he knew it was "wrong" to endorse Couch's and McCoy's names on the checks and that he had "forged" such names. We, of course, do not resolve conflicts in evidence in determining whether an issue is raised. United States v Moore, supra. Moreover, the accused's testimony concerning the wrongfulness of his act and his pretrial conclusion that it constituted forgery must be read in context. When so considered, it is obvious that the former may have referred to lack of actual authority to make the signatures and that the latter is nothing more than an untutored legal conclusion totally inconsistent with the rest of his declarations. In short, we leave the real effect of these bits of proof to the fact finders.

We likewise reject the argument

that accused intended at the trial solely to defend upon the basis of his intoxication at the time he endorsed the checks. Cf. United States v Mundy, 2 USCMA 500, 9 CMR 130; United States v Bowers, 3 USCMA 615, 14 CMR 33. The final arguments alone make it quite clear that both parties understood accused's position to be his assertion that he owned the checks and that intoxication was principally important as it bore upon the honesty of their negotiation.

The Government's final contention would normally require extended attention. It asserts that the doctrine of waiver should be enforced, as no request was made for an instruction on the principles of mistake of fact. We need not decide whether such advice must be requested or is required to be given *sua sponte*. Assuming *arguendo* that a request is necessary, it is clear from the evidence presented and the relative positions of the parties to the trial that the central issue was the effect of accused's honest belief concerning the checks. While we cannot pretend to understand counsel's failure to seek appropriate guidance for the court members, we are reluctant to charge the accused with responsibility when the result would be a clear miscarriage of justice. United States v Masusock, 1 USCMA 32, 1 CMR 32; United States v Smith, 2 USCMA 440, 9 CMR 70. We accordingly conclude that, under the particular circumstances of this case, it was prejudicially erroneous not to advise the court members with respect to the defense of mistake of fact.

Left for consideration is the effect of the law officer's advice to the court that "the method of how [accused] came in possession of the checks in question . . . has no bearing on the offenses charged." Our examination of the record makes it apparent that his purpose, in which counsel acquiesced, was to prevent the members from improperly considering accused's admitted participation in the offenses of gambling and drinking in barracks which were not charged against him. See

United States v Hoy, 12 USCMA 554, 31 CMR 140, and United States v Pavoni, 5 USCMA 591, 18 CMR 215. Unfortunately, the language of his instruction was ill-chosen and removed from the members the authority to consider the evidence regarding the manner in which he came into possession of the checks. As we have pointed out the importance of that circumstance with regard to the issue of mistake, we are required to conclude that his advice here was erroneous and harmful.

In sum, then, we find that an issue of mistake of fact was raised by the evidence and that, under the circumstances here depicted, the law officer was required to instruct the court with respect thereto. His failure to do so and his broad advice to disregard the manner in which the checks were obtained so affected the proceedings that reversal must be had despite counsel's inaction at the trial level. It is so ordered.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. The board may reassess the sentence on the basis of the findings of guilty of absence without leave or order a rehearing on the forgery charges and the penalty.

Chief Judge QUINN and Judge KILDAY concur.