UNITED STATES, Appellee

v

GEORGE H. STEPHEN, Airman Third Class,
U. S. Air Force, Appellant

15 USCMA 314, 35 CMR 286

No. 18,189

April 2, 1965

*Lieutenant Colonel Joseph B. McMullin* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

### Opinion of the Court

KILDAY, Judge:

Convicted by general court-martial of larceny of nine cylinder heads, property of the United States Government of value of about $2,745.00, under Article 121, Uniform Code of Military Justice, 10 USC § 921, the accused was sentenced to dishonorable discharge, total forfeitures, confinement at hard labor for two years, and reduction to the lowest enlisted grade. The convening authority approved the findings and sentence but the board of review approved a guilty find-

314

ing of larceny of only *some value* as to the items allegedly stolen and affirmed only a dishonorable discharge, total forfeitures, confinement at hard labor for six months, and reduction.

We granted the accused's petition for review to determine whether the failure to instruct on accomplice testimony was plain error.

The case for the prosecution rested almost exclusively on the testimony of Airman Amos. Both the accused and Amos were members of the 405th Supply Squadron and lived in the same barracks. Amos, as an "expedite deliverer" (truck driver), transported needed parts from the warehouses to different organizations on the base. Stephen, among others, handled the telephone in the expedite section, received calls for material, and prepared the necessary forms for use by the expedite deliverer.

According to Amos, the theft was accomplished on two different nights and consisted of separate thefts of four and five cylinder heads respectively from warehouse No. 8. On each occasion, Amos testified, the accused was present.

"The first time we took 4 we went into warehouse 8. I loaded the 4 cylinder heads on a forklift and took them down to warehouse 10. Then I proceeded to open them with a screw driver and hammer.

"Q. You say we. You and who else?

"A. Airman Stephen. We took them out of the boxes and put them in a pickup truck the same night. The same procedure with the 5 and we put them in a ton-and-a-half and took them to the TACAN Site.

"Q. Who took them to the TACAN Site?

"A. I did. Airman Stephen did *not go with me*, Sir. There was another airman with me.

• • • • • •

"Q. Airman Amos, how did you first get involved in taking these cylinder heads?

"A. I was influenced by Airman Stephen and another airman."

After explaining, in reply to inquiry by defense counsel, that the airman who accompanied him to the TACAN Site was still another unidentified airman different from the one who, in concert with the accused, influenced him to steal, Amos stated that upon arrival at the TACAN Site, he and this individual put the cylinder heads under the fence with the assistance of some waiting Filipinos. He did not know the identities of the Filipinos. During the time of delivery Amos believed that the accused went to chow. Upon returning to warehouse No. 10, Amos further testified that he destroyed the then empty boxes.

On the day following each theft, Amos went on to relate, he was paid 350 and 500 pesos, respectively, by the accused. My "understanding was that I was getting paid for what I have [sic] done the night before."

In cross-examination, Amos denied making a previous statement contrary to his testimony in court that accused on one occasion said, "we are still in business." After showing the witness a statement given by him under oath to the Office of Special Investigations, Amos admitted he had previously attributed this statement to one Airman Cordier (the unidentified other airman who had influenced him). He testified he was telling the truth both times as he had previously thought that Cordier had made the statement but was now positive that the accused had made it.

Airman Dacus, also an employee of the expedite delivery section, testified that on the evening of the second theft he noticed five boxes on a pallet located in warehouse No. 10. The boxes were unopened. Believing the boxes were out of place, he copied the stock number from a form pasted on the side and by use of the locator file in warehouse No. 11 determined that their correct location was warehouse No. 8. Later that same evening he observed the boxes had been opened and were then empty. Still later he saw Amos destroy the boxes. Since the boxes were unopened, Dacus did not know whether in fact they contained cylinder heads. Nor was he aware of whether cylinder heads were missing.

**315**

Dacus saw the accused in warehouse No. 10 on that evening and on occasion saw him in company with Amos; however, he had no discussions with him and saw no activity which connected the accused with the boxes.

The only other Government witness was Staff Sergeant Combs, noncommissioned officer in charge of the special activities section of base supply who merely identified Federal Stock Number 2815–353–8297 as pertaining to cylinder heads. He had no knowledge of any loss of cylinder heads. At this point defense counsel entered into a stipulation that the unit value of the item represented by this number was $305.00.

The accused testified on the merits and denied the accusations of Amos. He often rode with Amos since the latter was a driver, had access to a vehicle, and it was usual for the expedite driver to drive the other airmen to the mess hall for meals since this was the only transportation available. The mess hall is a drive of more than five or six minutes.

The accused could not remember whether he was with Amos on the nights in question and could not say whether he helped Amos load materials on the truck on either night. However, he often did help the driver of the truck load articles on it, especially if they were heavy. Since they were both working nights at that time it is possible that he was in the warehouse with Amos helping him but he would have no knowledge of the identity of the property. While he had never associated off-base with Amos, the accused, in view of their common barracks residence and association on the job, on occasion had loaned Amos small sums of money. On the average these loans were about five dollars, or the equivalent in pesos, but never as much as 350 or 500 pesos.

It is at once apparent that virtually the entire case for the prosecution, including the fact of theft, depended upon the testimony of an admitted thief, Amos.[1] The only other indication that a theft of cylinder heads might in fact have occurred was reflected in the testimony of Dacus that he saw some unopened boxes in warehouse No. 10 which belonged in warehouse No. 8. He noted the nomenclature thereon but was not personally aware of the identity of the articles represented thereby. The later empty boxes indicated the contents had been removed, but only Amos said the former contents were then stolen and that they were cylinder heads. Insofar as accused's complicity in the alleged theft is concerned, Amos alone pointed the finger. Stephen's mere presence in warehouse No. 10 on the night of one of the thefts, as testified to by Dacus, is not enough to convict. And, as explained by the accused, was as consistent with innocence as with an inference of guilt by association. He, too, worked in the expedite delivery section of base supply and there was no evidence that his presence in the warehouse was unusual. At least the prosecution made no effort to rebut his perfectly logical explanation.

In essence then the court-martial members were faced with a pure question of credibility. Whom to believe—Amos or Stephen? It is true the law officer instructed on credibility of witnesses and on reasonable doubt, including the presumption of innocence of an accused, but, as given, these instructions were merely a restatement of "barren and abstract legal principles" (United States v Smith, 13 USCMA 471, 33 CMR 3) and not at all tailored to the particular facts of this case. See also United States v Moore, 15 USCMA 187, 35 CMR 159; United States v Jones, 13 USCMA 635, 33 CMR 167; United States v Shanks, 12 USCMA 586, 31 CMR 172; United States v Acfalle, 12 USCMA 465, 31 CMR 51.

Concededly, defense counsel did not ask for additional or clarifying instruc-

---

[1] The staff judge advocate, in his post-trial review, noted that Amos, at the time of this trial, had been convicted by a *special* court-martial for his participation in this offense. Before this court, counsel advised that Amos pleaded guilty and was sentenced to bad-conduct discharge and three months confinement at hard labor. The convening authority commuted this sentence to six months confinement at hard labor and no discharge.

tions or object to those given and, as argued by the Government, perhaps he should not now be heard to complain. Rule 30 of the Federal Rules of Criminal Procedure. However, under Rule 52(b), "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Subsequent to the adoption of the Rules and for a time thereafter the decisions were in conflict as to whether the latter Rule "authorize[s] the consideration of matters which another rule [30] specifically states shall not be assigned as error." Herzog v United States, 226 F2d 561, 570 (CA 9th Cir) (1955), cert den, 352 US 844, 1 L ed 2d 59, 77 S Ct 54. In the cited case, the court held that it did not and sustained its position by citing cases in other circuits. (Herzog v United States, supra, footnote 2, page 568.) On a hearing on this specific issue the court, sitting en banc, acknowledged that it had previously held:

"... that the provision of Rule 30, quoted above, forecloses the courts from noticing on appeal errors or omissions in instructions where objection thereto was not made below. See the opinion, 226 F2d at page 567 et seq." [Herzog v United States, 235 F2d 664 (1956).]

However, on reconsideration it modified this position and stated that:

"... But, in common with the generality of the circuits, we recognize that the Rule does not debar us from noticing of our own motion error in instructions thought to have resulted in a miscarriage of justice." [Herzog v United States, supra, at page 667.]

See also Lyons v United States, 325 F2d 370 (CA 9th Cir) (1963), to the same effect, quoting from the second Herzog opinion; Jonson v United States, 281 F2d 884 (CA 9th Cir) (1960).

In Lash v United States, 221 F2d 237, 240 (CA 1st Cir) (1955), cert den, 350 US 826, 100 L ed 738, 76 S Ct 55, the court stated that:

"... should the Rule [30] be rigidly applied, appellate courts would be powerless to correct grave miscarriages of justice resulting from serious errors in the charge whenever a defendant or his counsel through ignorance, inadvertence, or inexperience failed to object before the jury retired to consider its verdict. Therefore, appellate courts will take notice of errors asserted by counsel for the first time on appeal, and also notice errors sua sponte, when in their discretion notice of the error is necessary to prevent an injustice. The guiding principle with respect to spontaneous notice of errors, which also applies to notice of assertions of error made by counsel for the first time on appeal, was clearly and succinctly stated in United States v Atkinson, 1936, 297 US 157, 160, 56 S Ct 391, 392, 80 L ed 555 as follows: 'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.' See Screws v United States . . . [325 US 91, 107, 89 L ed 1495, 65 S Ct 1031 (1945)]; Yoffe v United States, 1 Cir, 1946, 153 F2d 570, 576 and see also Terminiello v City of Chicago, 1949, 337 US 1, 69 S Ct 894, 93 L ed 1131, wherein the problem is discussed by several members of the Court although in a slightly different setting."

In accord see Fisher v United States, 328 US 463, 467–468, 90 L ed 1382, 66 S Ct 1318 (1946); United States v Marachowsky, 201 F2d 5 (CA 7th Cir) (1953); Tatum v United States, 190 F2d 612 (CA DC Cir) (1951); Fischer v United States, 212 F2d 441, 444 (CA 10th Cir) (1954).[2] As stated by the Supreme Court in Fisher v United States, supra:

"Although no objection as to the form of these instructions is urged

---

[2] See also collation of authorities in Annotations to Rule 52(b), Federal Rules of Criminal Procedure, particularly notes 85 and 86, Title 18, U. S. Code Annotated, Rules 32 to End.

here by counsel for petitioner, this Court in a criminal case may notice material error within its power to correct even though that error is not specifically challenged. . . . Brasfield v United States, 272 US 448, 71 L ed 345, 47 S Ct 135; Compare Rules . . . 52(b)."

See also Singer v United States, 380 US 24, 13 L ed 2d 630, 85 S Ct 783 (1965).

The decisions in this Court on this particular issue are in accord. In United States v Ebarb, 12 USCMA 715, 718, 31 CMR 301, we stated:

". . . While we cannot pretend to understand counsel's failure to seek appropriate guidance for the court members, we are reluctant to charge the accused with responsibility when the result would be a clear miscarriage of justice. United States v Masusock, 1 USCMA 32, 1 CMR 32; United States v Smith, 2 USCMA 440, 9 CMR 70."

What then of the case at bar? Was the law officer's failure to give a cautionary instruction as to the weight to be given to the testimony of Amos, although not requested, plain error? *Under the circumstances of this case,* we believe it was. Lest it be thought that we are herein promulgating a new rule requiring *sua sponte* instructions on accomplice testimony, in *all* cases where such a witness testifies, we reiterate our holding in United States v Schreiber, 5 USCMA 602, 18 CMR 226, at page 609, that in general "the absence of a request for special instructions precludes consideration upon appeal. Caminetti v United States, 242 US 470, 61 L ed 442, 37 S Ct 192." Defense counsel would be well advised to heed closely this admonition.

Were we here faced with a refusal of the law officer to instruct on accomplice testimony, the problem would be easily resolved. For it is well settled, in this Court, that "it is error for a law officer to refuse, *in a proper case*, a request for an instruction on accomplice testimony, which reasonably puts him 'on notice' that the issue is essential to a proper finding." United States v Bey, 4 USCMA 665, 671, 16 CMR 239. (Emphasis supplied.) See also United States v Winborn, 14 USCMA 277, 34 CMR 57; United States v Scoles, 14 USCMA 14, 33 CMR 226. Each of the cited cases was found to be a "proper case" and the law officer's refusal to instruct constituted prejudicial error requiring reversal. The basic reasoning behind the rule for a special instruction on accomplice testimony was thoroughly explored and set forth in *Winborn* and *Scoles,* supra, and need not be restated. Suffice it to say that an accomplice "has a 'built-in' untrustworthiness" (Lyda v United States, 321 F2d 788, 794 (CA 9th Cir) (1963)), and "A skeptical approach to accomplice testimony is a mark of the fair administration of justice." Phelps v United States, 252 F2d 49 (CA 5th Cir) (1958), at page 52.

It can hardly be denied that an instruction on accomplice testimony was not only relevant on the facts in this case, but all-important to the accused's defense. There is no question but that Amos was considered as an accomplice, for he was so described by trial counsel in his opening remarks and closing argument. Amos himself stated he was assisted in the theft by the accused and in disposing of the property by an unidentified airman. In this he was either their accomplice or, conversely, they were his accomplices. But Amos was the only one who testified that the accused was involved in the thefts. Clearly, if his testimony had been disbelieved, the accused would have been acquitted. Therefore, it was of vital importance to the accused to have the benefit of a special instruction on accomplice testimony. The Government having utilized Amos' testimony to establish the theft and accused's alleged participation therein, carries the burden of credibility in him. See United States v Winborn, supra, at page 282. Absent such an instruction, the accused was deprived of his right to have the court members consider Amos' testimony in its proper light. United States v Winborn, supra. As stated by Judge Learned Hand in United States v Becker, 62 F2d 1007, 1009 (CA 2d Cir) (1933), "It is usually desirable to give it; in close cases it may turn the scale."

318

In Williamson v United States, 332 F2d 123, 126, 132 (CA 5th Cir) (1964), faced with a situation wherein "On the intrinsic facts, credibility made the case a close one," that court reversed and remanded for a new trial although there had been neither a request for such an instruction nor exception to those given. The court held that:

". . . this is that exceptional case in which an error not preserved must yet be noticed since on this record a fair trial required that the jury be properly instructed on the evaluation and use of accomplice testimony.

• • • • • •

"In the final analysis, it is not the parties who determine the charge the judge gives to the jury. The obligation rests squarely on the shoulders of the trial judge. Of course the system of time-tested rules of procedure can rightfully expect competent counsel to request appropriate charges or object to affirmative errors or significant omissions. But there are occasions, and this Court recognizes them year by year, in which the trial court's erroneous action has such immediate and significant consequence that it must be noticed as plain error.[3] We think the omission of the charge on accomplice testimony was plain error, and the only way to eradicate it is to grant a new trial."

In United States v Persico, 305 F2d 534, 536 (CA 2d Cir) (1962), the court stated:

"The Government's case rested entirely upon the uncorroborated testimony, inconsistent with his earlier testimony in some respects, of an accomplice and co-conspirator who had the strongest possible reasons to become a Government witness. We must therefore scrutinize any claimed error with extreme care since there is grave possibility of prejudice to the defendants in a case such as this

by error which might in other circumstances be deemed relatively minor. Glasser v United States, 315 US 60, 67, 62 S Ct 457, 86 L ed 680 (1942)."

And in Phelps v United States, 252 F2d 49, 52 (CA 5th Cir) (1958), Judge Wisdom, after commenting on the advisability of "including a caution against placing too much reliance upon the testimony of an accomplice," said:

"Whether the error is reversible error depends on the circumstances of each case and the conduct of the trial as a whole." [*Ibid*, at page 53.]

See also Dunn v United States, 318 F2d 89 (CA 5th Cir) (1963).

We are not unaware of the fact that the court in Starks v United States, 316 F2d 45 (CA 9th Cir) (1963), held that the giving of such an instruction might be construed by the jury as indicating that the court thought appellant had participated in the offense where, as here, the accused had denied any complicity therein. In *Starks, three* witnesses testified as to the defendant's possession of the unregistered weapon and presumably, though not specifically so stated in the appellate court's opinion, the gun was found in the actual possession of one of them. In this case only one witness linked the accused with the offense, there was no recovery of the allegedly stolen articles, and no direct evidence of loss of such material by the Government. Only in the testimony of Dacus was there some corroboration on this element.

In the context of this case we believe that the value of the instruction to the accused far outweighs any possible adverse inference the court members might receive thereby.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.

---

[3] See cases cited in Williamson v United States, 332 F2d 123, footnote 13, at pages 132 and 133.