UNITED STATES, Appellee

v

WALLACE K. POND, II, First Lieutenant, U. S. Air Force, Appellant

17 USCMA 219, 38 CMR 17

No. 19,977

August 18, 1967

 
██ █ 

*Lieutenant Colonel Carl R. Abrams* argued the cause for Appellant, Accused. With him on the brief were *Colonel Dwight R. Rowland* and *Colonel Joseph Buchta.*

*Lieutenant Colonel Harry O. Hinz* argued the cause for Appellee, United States. With him on the brief were *Colonel James R. Thorn* and *Colonel Emanuel Lewis.*

## Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial convened at Maxwell Air Force Base, Alabama, charged with two specifications of larceny and three specifications of conduct unbecoming an officer and a gentleman, in violation of Articles 121 and 133, Uniform Code of Military Justice, 10 USC §§ 921 and 933, respectively. He pleaded not guilty but was found guilty of only one specification of each of the above-numbered articles and sentenced to be dismissed from the service. Intermediate appellate authorities have approved the findings and sentence. We granted review to consider several assignments of error.

A short recital of the evidence is necessary to place this case in proper perspective. Two witnesses, Mr. E and Mrs. M, both employees of the Town and Country Store at Gunter Air Force Base,[1] testified that they observed

the appellant remove a price tag from a plastic covered six-cup muffin tin, priced to sell at $1.00, and place it on a twelve-cup muffin tin, similarly covered with plastic, priced to sell at $1.80. He then placed the larger tin in his shopping cart with his other items and proceeded to the check-out counter. While Mr. E went to get the manager, who was in a store three doors away, Mrs. M went to the check-out counter and assisted in placing the appellant's purchases in a bag. A third party recorded the purchases on the register, and the tape, which was stapled to the bag after completion, reflected one item as having been sold at $1.00. The manager, who arrived during this procedure, asked whether he could check the purchases and requested that the appellant accompany him to the stock room. There the manager looked at the muffin tin and observed that it bore a price tag of $1.00. He then placed it on a heater in the stock room. It almost at once began to sizzle and when he grabbed it off the heater, the price tag was gone. It had either burned or melted.

---

[1] Gunter Air Force Base is in the chain of command under Maxwell Air Force Base.

While the manager was conversing with the appellant, Mr. E arrived in the stock room with a six-cup muffin tin from which the price tag had been removed.

Mrs. M also testified that she had a particular reason for watching the appellant and that she alerted the other witness to keep an eye on the lieutenant. She stated that about two months previously, while she was acting as cashier, the appellant attempted to purchase a Teflon sauce pan. When he brought it to the check-out counter, the pan had a $3.50 price tag on it. She refused to sell it to him, stating that it belonged to a set. After replying that he had bought other pieces like it, he replaced it on the shelf. The witness later examined the sauce pan and the price tag was gone.

On cross-examination, she testified that she first became suspicious of him in September 1964, some fifteen months prior to the current incident. At that time, she was selling pipes in the Base Exchange. The appellant purchased a pipe as she was leaving for lunch. Since the pipe appeared to be of a value more than $1.90, the amount registered by the cashier, a temporary employee, she reported the incident to the manager of the Exchange.

The appellant testified at trial and categorically denied the charges. He recounted his activities in the store, in pertinent part, as follows:

"I got a cart and I picked up some milk, bread, and several other things. As I was walking down the east side when I got to the area where the muffin tins were, since we had two Teflon articles and my wife was quite pleased with them I thought it very logical to get a Teflon muffin tin. She also burns muffins. I picked up the small one and saw it was one dollar. I looked at the large one and it was $1.80. I was holding them up, looking back and forth, seeing which one she might prefer, and I glanced down and noticed the second one of the large ones, which was then on top—the second one had a dollar tag on it. This was pleasing to me. I picked it up to look at it to see where it was damaged and I could not see any damage enough to warrant not buying it, so I thought I could get the large one for the price of the small one. I noticed the price tag was only about half stuck and I pushed it down as I put it in my cart. I guess this took two or three minutes in all."

Thereafter, the appellant stated, he proceeded to the check-out counter and paid for his purchases. When approached by the manager, he acceded to his request to accompany him to the stock room. There the manager proceeded to remove the articles from the shopping bag and to check them off against the sales slip. When he came to the muffin tin, the manager inquired of Mr. E, who was also present, as to the price of the article. When the latter replied, " '$1.80,' " the manager turned to the appellant and said, " 'You owe us eighty cents.' " While reaching for his wallet to pay the eighty cents, and as he was about to explain that the muffin tin had a one dollar tag on it, Mr. E stated, " 'And I saw him switch the tags.' " At that point appellant decided,

". . . I wasn't going to pay anybody anything. I wanted to know what he was driving at. Mr. F . . . said again, 'You owe us eighty cents.' Mr. E . . . said something to the effect that he saw me tear the cellophane. In the meantime Mr. F . . . had turned the thing upside down and set it on the heater, and he said again—only this time I considered it to be in a very condescending tone of voice. . . .

"TRIAL COUNSEL: I object as to the tone of voice.

"LAW OFFICER: He can make an observation. Objection overruled.

"A. (Continued) This time he said, 'You owe us eighty cents'—well, I blew by this time—I was already worked up. I said, 'In the first place I did not switch tags; in the second place you are burning up the cellophane on the heater; in the third place I resent all of this.' He said, 'Go get the police.' "

According to the appellant's testi-

mony Mr. E left the stock room and when he returned Mrs. M was with him. He further related,

". . . She walked up and said, 'I saw him switch tags, too.' I protested. I decided the boss of this was Mr. F . . . and I turned the conversation back to Mr. F . . . , and said, 'I don't know whether you are aware of the eighty cent discrepancy in the price; it had a dollar tag on it. I will give you the eighty cents, or you give me my dollar back and keep the muffin tin, but let's settle this thing now.' I guess he thought he was committed. The Air Police showed up, and the Air Policeman, Mr. E . . . , Mrs. M . . . , and myself walked over to the Air Police office."

By testimony and stipulation, the defense established the excellent reputation, character, credibility, and efficiency of the appellant.

The entire thrust of the defense in this case, in addition to the denial by the appellant, was aimed toward convincing the court that no price tags were ever switched and that not infrequently identical items are marked differently. In this regard, Mr. E, on cross-examination, admitted that it was not unusual for price stickers to fall or come off merchandise, especially where one item was stacked on top of another, as in this case; that he had torn hundreds of similar stickers from cellophane wrappers in the course of his employment and it was his experience every time he did so the cellophane under the sticker would tear off also. Mrs. M related that in her experience, when price stickers are removed from cellophane, the cellophane is torn away with the sticker and there is no sticky surface to allow it to adhere to something else; that price stickers on all Teflon merchandise costing $1.00 or more were put on at the warehouse and not by employees at the store. A defense witness testified that subsequent to the alleged offense he had observed the purchase, by individual defense counsel, of two muffin tins at the Town and Country Store. These two tins, admitted into evidence, although identical in ev-

ery way, were differently priced. One was marked forty-nine cents and the other seventy cents. A former employee of the store testified that it had been his experience in the one year he worked there that articles in stock had often been mispriced. When counsel attempted to pursue this course with another witness who, ostensibly, would have testified covering certain items which were in a bag then in possession of counsel, the law officer sustained trial counsel's objection on the ground that such evidence was irrelevant. The law officer informed counsel that he "believe[d] any further testimony from any other witness regarding the same thing is really a courtroom condemnation of the Exchange Service system as it existed in the Town and Country at Gunter, and is considerably far afield from the purpose of our being here today."

Initially, we consider appellate defense counsel's assertion that the law officer's curtailment of the defense effort to bolster its case by presenting additional evidence of the mismarking of identical items was erroneous. The Government argues that since "THE RECORD CONTAINS ABUNDANT EVIDENCE ESTABLISHING THE FACT THAT THERE WAS MISPRICING OF ITEMS WITHIN THIS PARTICULAR EXCHANGE SYSTEM" additional evidence on this issue was redundant.

We do not agree. This was a central facet of the defense case. The appellant asserted that the muffin tin bore a price tag of $1.00. The prosecution's case reflected that it *should have* had a price tag of $1.80. The store manager had testified that ordinarily ninety-five percent of the items of merchandise in the store were marked correctly. However, Mrs. M was most emphatic in her testimony that at no time had she or her employees ever observed any items coming from the warehouse mismarked or mispriced, "because we check them." Counsel apparently intended to elicit from the witness then under interrogation, and one other, similar testimony as to mispricing. The law officer viewed such additional evidence as repetitive, "As-

suming that it is proper in the first place."

It can hardly be argued that the proffered evidence was irrelevant for it was of the essence of the appellant's defense. As stated in 1 Wharton, Criminal Evidence, 12th ed, § 211, page 432:

"When the accused has explained circumstances against him, he may offer evidence that tends to corroborate his explanation."

And in Underhill, A Treatise on the Law of Criminal Evidence, 5th ed, § 11, page 14:

"It is fundamental that each side has the right to introduce evidence to the contradict, explain or minimize the effect of adverse evidence."

To the extent that the law officer appeared to agree with trial counsel's contention that such evidence ██ was irrelevant, he was in error. The question then remains whether sufficient testimony was allowed on this issue so as to classify additional data redundant or repetitive. We think not. While the law officer is the final arbiter on the quantum of .evidence to be allowed on a particular point, he should, in all fairness, permit counsel a reasonable latitude. Only one witness testified as to a specific instance of mispricing and another generally stated that he had seen evidence of mispricing in the stock room. Since the colloquy between counsel and the law officer occurred outside the hearing of the members, the latter were unaware of the additional evidence and might reasonably have assumed that this was all the defense was able to offer. Counsel only desired to present two more witnesses in this regard. In the context of this case, we' believe this was reasonable and that the law officer was in error.

The second issue on which we granted review is whether the law officer erred in not giving an instruction on credibility of witnesses and the effect of prior inconsistent statements.

Appellate defense counsel concede that individual defense counsel made no request for such instructions at trial but point out that the law officer did not confer with counsel on proposed instructions and did not ask counsel whether they objected to those given or desired additional instructions. Counsel, in urging that we find error herein, call attention to the fact that while appointed military counsel sat at the defense table, the defense in chief was handled almost exclusively by a civilian attorney retained by the appellant and that there is a fair risk the civilian attorney did not appreciate his right to propose additional instructions.

The basic responsibility for proper instructions rests upon the law officer. United States v Sitren, 16 USCMA 321, 36 CMR 477, and citations of authority at page 322. This burden is particularly heavy, where, as here, no effort is made by the law officer to determine whether counsel desires special or additional instructions.

The issue before the court narrowed down simply to whether the testimony of the appellant raised a reasonable doubt as to the accuracy of the testimony of the Government witnesses. Counsel bolstered the appellant's denial of wrongdoing by extensive evidence reflecting his outstanding character and reputation. By contrast, he attempted to attack the credibility of the alleged eyewitnesses by showing age, infirmities, hypersuspiciousness, possible motivation for refusing to retract an accusation once made, and inconsistencies in their testimony. In addition, both Mrs. M and Mr. E were impeached on specific points by the testimony of a fellow employee. In one particular instance the store manager testified that as he and the appellant waited in the stock room they saw an air policeman approach. As the manager started in his direction the appellant allegedly laid his hand on the former's arm and attempted to get him to draw back. In cross-examination, he admitted he had made no such statement either during the air police investigation or at the Article 32 hearing. A court member inquired whether it was "proper to introduce new evidence" like this and the law officer stated, "I will instruct you on the law at the proper time." No specific in-

**223**

struction was given as to this or as to other inconsistencies between testimony at trial and that given at the prior time.

The Government contends that instructions on the issues of credibility of witnesses and prior inconsistent statements are in the nature of "special instructions" which must be specifically requested or considered as waived (United States v Flippen, 16 USCMA 622, 37 CMR 242); or, in the alternative, if the omission of instructions in this area constituted error, it was not "Plain error." Cf. United States v Stephen, 15 USCMA 314, 35 CMR 286.

Indeed, in United States v Stephen, supra, we thoroughly discussed the giving of special instructions and whether they should be noted for the first time on appeal. In that case, as here, the issue was the credibility of the Government witness and we there reiterated "our holding in United States v Schreiber, 5 USCMA 602, 18 CMR 226, at page 609, that in general 'the absence of a request for special instructions precludes consideration upon appeal. Caminetti v United States, 242 US 470, 61 L ed 442, 37 S Ct 192.' " (Ibid., at page 318.) In Stephen, the law officer instructed on credibility of witnesses and on reasonable doubt, including the presumption of innocence, but not on the weight to be given accomplice testimony and no such instruction was requested. Under the particular facts of that case we held this omission to be plain error under Rule 52(b), Federal Rules of Criminal Procedure, and prejudicial for "Absent such an instruction, the accused was deprived of his right to have the court members consider Amos' testimony in its proper light." (Ibid., at page 318.)

So, too, in this case. The credibility of the witnesses was of such vital importance that we will notice the failure to properly instruct in this area as plain error, for we are reluctant to charge the appellant with responsibility for his counsel's failure to seek appropriate guidance for the court members when the result would be a clear miscarriage of justice. United States v Stephen, supra; United States v Ebarb, 12 USCMA 715, 31 CMR 301.

One final issue merits our consideration; that is, the sufficiency of the evidence to support the convictions for larceny and conduct unbecoming an officer. Since the proof of the latter is dependent upon a conviction for larceny, both will fall in the event the evidence of larceny is insufficient.

The Government elected to prove the *corpus delicti* of larceny on the theory that the accused switched price tags, and presented the testimony of eyewitnesses to that effect. The only evidence in the record that the muffin tin *originally* bore a $1.00 price tag was that of the accused. (Both Mrs. M and the store manager attested to the fact that such a tag was on the item when the appellant paid for his purchases and later in the stock room.) According to the store's stock records and from visual observation of several other muffin tins from the same stack, the price tag should have been $1.80. The tags are affixed to the merchandise at the warehouse and not by store employees. Finally, the Government presented a smaller muffin tin, supposed to sell for $1.00, which had a hole in the cellophane where the price tag should have been. Neither of the price tags was before the court, the $1.00 tag having been lost when the muffin tin was placed on a heater. The prosecution was unable to produce the $1.80 price tag.

The *corpus delicti* in larceny is constituted of two elements: (1) that the property was lost by the owner; and (2) that it was lost by a criminal taking. 32 Am Jur, Larceny, § 121, page 1033. The *corpus delicti* may be proved by circumstantial evidence (52 CJS, Larceny, § 129, at page 965); but "in such a case the essential fact or facts must be established beyond a reasonable doubt by evidence of the most cogent and irresistible kind." State v Elmore, 126 Mont 232, 247 P2d 488, 492 (1952).

While we find the evidence minimally

224.

sufficient to present a question for the fact finders, a few comments are in order. If the appellant did, in fact, remove the price tag from the smaller muffin tin which was admitted in evidence, then the cellophane adhered to the back of the tag as evidenced by the hole. But according to the testimony of Mrs. M, there is no longer a sticky surface to allow it to adhere to something else. How then could this tag remain affixed to the tin in question during all the time of its being handled by the appellant, at the check-out counter, and by the manager in the stock room? Possibly the appellant was farsighted enough to bring along some additional stickum, but there is no such evidence in this case. The fact that other large tins in the same stack were priced at $1.80, and that all of them *should have been* so marked, is some evidence that the tin in question was similarly marked; however, is this evidence so "cogent and irresistible" as to constitute *prima facie* evidence of a *corpus delicti* when consideration is given to the evidence of *mispricing of identical items* presented by the defense? Had counsel not been improperly curtailed in his presentation of such evidence, this case might not now be before us.

The price tags are affixed to this merchandise at the warehouse, and not in the store, and we have no evidence as to the procedure utilized there for assuring that pertinent items are properly priced. Mrs. M testified that the tags are checked when the merchandise arrives at the store. She also testified that not infrequently tags become loose and fall off. Given the similarity between a tag for $1.00 and one for $1.80, it is not inconceivable that an incorrect one could have been put on in the warehouse or replaced in the store. In point of fact, the appellant explained that the price tag on the muffin tin which he purchased was loose and he pressed it down with his finger.

The situation in the Town and Country Store was such that it had a regular training program for the employees at which one of the items discussed was price tag switching. As the manager testified: "We always instruct them if

they have any suspicion of anyone we would like to keep them under surveillance and check them out closely to see if it's actually true or not." Mrs. M was suspicious of an unidentified sergeant because "He was spending quite some time in the store." "There are others; you have to watch them." She suspected Lieutenant Pond, as indicated above, and directed Mr. E to help her keep an eye on him. While she watched from a vantage point twelve feet away, Mr. E was exercising a similar vigil some forty feet away. In such an atmosphere of suspicion, defense counsel's comment to the law officer, "they think they saw something they did not see," seems most appropriate.

In addition to the matters we have considered above, we note, as did the board of review in its initial opinion on December 16, 1966, that while the law officer told the court that evidence of alleged other misconduct (apparently the pipe and sauce pan incidents related by Mrs. M) could not be considered as guilt of the current charges and specifications, he did not so instruct them with regard to the sentence. As the board stated:

"It is firmly established that the law officer has a duty, *sua sponte,* to instruct the court that evidence of other misconduct cannot be considered by it on the sentence or for any purpose other than that for which it was received (U. S. v Turner, 16 USCMA 80, 36 CMR 236; cf. U. S. v Conrad, 15 USCMA 439, 35 CMR 411; U. S. v Gewin, 14 USCMA 224, 34 CMR 4). The prejudicial effect of the erroneous omission to instruct may be purged by our reassessment of the sentence (U. S. v Turner, *supra*)."

Needless to say, the board approved the sentence of dismissal. On reconsideration, January 23, 1967, the board adhered to its prior decision.

The appellant is a regular officer in the Air Force. He completed Officer Training School at Lackland Air Force Base as a distinguished graduate and was commissioned as a second lieutenant in September 1963. As we have noted, he was assigned to Gunter Air

Force Base, Alabama. The matter was referred to Maxwell Air Force Base, Alabama, because the commanding officer at Gunter did not then exercise general court-martial authority over his command. Subsequent to trial, Major General James B. Tipton, Commander, Gunter Air Force Base, forwarded the following self-explanatory communication, found among the allied papers in this record, to the Military Justice Division of the office of the Judge Advocate General of the Air Force. Because of its bearing on this case, we quote it in full:

"1. The following is being sent to you for presentation to the Board of Review in the accused's behalf.

"2. The above-captioned case has given me serious concern. I have known the accused since my assumption of command of the Montgomery Air Defense Sector in August 1964. His record as fully outlined in the case and accompanying papers was such that prior to the instant charges, he was selected to be an academic instructor at the Air Force Academy. I can do little to embellish that record except to state that in my opinion he is truly an outstanding young officer whose retention is in the best interests of the service.

"3. I realize that the above appears to be ambiguous since my command concurred in the transmittal of the original charges against him for trial. The explanation is simple. At the time I did not exercise general court-martial authority over my own personnel, such authority being vested in the Air University which had a judge advocate capability. At that time, I was given a general briefing simply to the effect that the accused was suspected of a large number of serious offenses allegedly establishing a pattern of fraud against the local Base Exchange. On that advice and my knowledge of the individual I recommended the matter be fully investigated and action as appropriate be taken.

"4. It is now to be noted that with one exception, all of the alleged wrongful conduct on the part of the accused was either summarily disposed of or he was found not guilty by the court. What remains in my opinion, is one specification of an attempt to defraud the Exchange of the insignificant sum of $.80. I do not wish to assert that my personal judgment is better than that of the court members or the convening authority, but in my opinion, the essential pettiness of the alleged offenses, the age and infirmities of the government witnesses, the inconsistencies of their testimony, the evidence of the accused's previously truly outstanding character and his persistent denial under oath of any wrongdoing are such that I do not feel the government has proved its case beyond a reasonable doubt. This is, of course, a matter that can be resolved by the appellate review agencies and I hope that this will be their conclusion. I cannot, however, too strongly reiterate that the best interests of the service and simple justice would be served by their arriving at the same conclusions and dismissing the charges."

The record and allied papers in this case are replete with testimonials to the good character and reputation of the appellant. The Commander (Colonel), the Chief of the Training Branch (Lieutenant Colonel), the Chief of the Direction Center Division (Lieutenant Colonel), all of the 32d Air Division, and the Chaplain, Gunter Air Force Base, without exception, recommended disapproval of the court-martial sentence. The post-trial clemency officer recommended that the sentence to dismissal be suspended for one year. And the Chaplain of the 32d Air Division stated that since he knows the appellant to be a person of the highest integrity he felt that a mistake had been made. He also expressed doubt as to the emotional stability of the witnesses, Mrs. M and Mr. E, based on his personal knowledge. In addition to the "exceptionally fine" (next to the highest possible rating) effectiveness reports received by the appellant which were introducd at trial, he was again rated subsequent to trial, for the period

December 23, 1965, to June 22, 1966. At that time, he was rated as "outstanding," the highest rating possible, and was recommended for promotion "well ahead of contemporaries." As noted in this last report, "Lt Pond possesses three college and university degrees; AA, BS, and MA. He has held the position as instructor in two universities and in high schools, and is currently an instructor at the University of Alabama. He holds the position of skilled Instructor Director at this Division." Prior to the date of the alleged offenses, the appellant had three times applied for, and been denied, duty in Vietnam, the last refusal being based on the fact that he had been selected for assignment as an instructor at the United States Air Force Academy.

The effectiveness of good character evidence was thoroughly discussed by us in United States v Conrad, 15 USCMA 439, 35 CMR 411, and will not be repeated. Suffice to say, as we noted in *Conrad,* at page 448, citing Edgington v United States, 164 US 361, 41 L ed 467, 17 S Ct 72 (1896):

". . . Evidence of good character may even be sufficient to generate a reasonable doubt as to an accused's guilt."

In light of the errors in this case, the decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.