**UNITED STATES, Appellee**

v.

**Roberto A. GITTENS, Senior Airman U.S. Air Force, Appellant.**

**No. 93–0432.**
**CMR No. 29227.**

U.S. Court of Military Appeals.

Argued March 2, 1994.

Decided June 17, 1994.

For Appellant: *Captain Eric N. Eklund* (argued); *Colonel Jay L. Cohen* (on brief); *Colonel Terry J. Woodhouse, Lieutenant Colonel Frank L. Spinner, Captain David D. Jividen.*

For Appellee: *Captain Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

COX, Judge:

Senior Airman Roberto Gittens stands convicted of attempted rape.[1] We granted re-

---

1. Appellant was charged with rape, forcible sodomy, and adultery, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively, but was ultimately convicted only of attempted rape, in violation of Article 80, UCMJ, 10 USC § 880. He was sentenced to a bad-conduct discharge, confinement for 1 year, and reduction to the lowest enlisted pay grade. The convening authority approved the sentence, and the Court of Military Review affirmed. 36 MJ 594 (1992).

We granted review of the following issues:

I

WHETHER THE JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF APPELLANT, BY FAILING TO GIVE AN ACCOMPLICE TESTIMONY INSTRUCTION DESPITE THE FACT THAT SEVERAL WITNESSES WERE ACCOMPLICES.

view of an issue involving a claim that the military judge failed, *sua sponte,* to give an accomplice instruction regarding three prosecution witnesses. In appellant's view, these witnesses were culpably involved in any offenses that may have been committed. The remaining granted issue concerns appellant's contention that the military judge improperly allowed the victim's sister to testify as a rebuttal witness. Up to that point in the proceedings, she had been in attendance at the court-martial and had observed the testimony. We hold that appellant waived the accomplice instruction and that the military judge did not err in permitting the sister's testimony.

I

The charges arose from a party appellant attended at the home of the 18–year–old victim, Andrea, a military dependent. Earlier that evening, Andrea went to the base non-commissioned officers' (NCO) club to meet her friend, Jennifer Williams, another military dependent. When the club closed, Andrea invited appellant and others to her house for a party; her parents and sister were away on a retreat at the time. At the party, many of the guests became intoxicated playing "quarters," a drinking game. The events of that night can be pieced together through the testimony presented at trial.

For the prosecution, Jennifer testified that she was not drinking alcoholic beverages on the night in question. She related that Andrea drank several "shots" playing "quarters," then went to lie down because she was tired. While Jennifer was cleaning the kitchen, Dexter Harris, a civilian, told her to go with him back to a bedroom where Andrea was resting. Dexter said to Jennifer, "I can't believe they're doing that to her." When Jennifer got to the bedroom, Andrea was on the bed; Corey Lyons, a civilian, was on his knees holding Andrea's hand, and Melvin Rasberry, a civilian, was in the back of the room. Jennifer was concerned that

the men were "trying to mess with" Andrea, and thinking appellant was Andrea's friend, she asked him to go to the bedroom and make the other men leave. Appellant went to the bedroom. Believing that appellant was with Andrea and that Melvin, Dexter, and Corey were out of the bedroom, Jennifer resumed cleaning up from the party.

While she was cleaning the living room, Jennifer heard Andrea scream, "You get off of me. You're hurting me." She hurried to the bedroom but was unable to open the door because the bed had been pushed in front of it. When the bed was moved and Jennifer was able to open the door, she saw appellant with his pants and underwear down; Andrea was laying on her back, naked from the waist down. Jennifer was "positive" that only Andrea and appellant were in the room. According to Jennifer's testimony, appellant left the room at that point, and Andrea

was crying. She said, "I can't believe he did this to me. He's supposed to be my friend." She said, "Bobby. . . . He was on top of me." . . .

Appellant went by the name, "Bobby," and no one else with that name, or any variant thereof, was identified as being at the party.

Dexter Harris was the next prosecution witness. He testified that he was "very" intoxicated at Andrea's party, but he remembers going three times to the bedroom in which Andrea was resting. The first time, he saw appellant and two other men in the bedroom with Andrea. The next time, appellant and Andrea were the only people in the room; appellant was sitting at the foot of the bed, and Andrea was lying on her stomach on the bed. The third time Dexter went to the room was with Jennifer, when the bedroom door was blocked by the bed. Dexter saw appellant in the room on that occasion and thought others were present, but he could not be sure due to his level of intoxication. On cross-examination, he testified that he recalled telling Jennifer that "there were guys back there 'pulling a train on'" Andrea.

II
WHETHER THE MILITARY JUDGE ERRED, TO THE [SUBSTANTIAL] PREJUDICE OF APPELLANT, BY ALLOWING, OVER DEFENSE OBJECTION, THE TESTIMONY OF [THE VICTIM'S SISTER], A GOVERNMENT REBUTTAL WITNESS WHO SAT THROUGH APPELLANT'S ENTIRE COURT–MARTIAL PRIOR TO BEING CALLED TO THE STAND.

Sergeant Cecil Henderson was also at the party. He testified that he was a designated driver that evening and that he had had very little to drink. Toward the end of the party, a commotion arose, and someone motioned for him to come to the bedroom. As he reached the bedroom door, someone inside the room instructed the person who had been motioning Henderson to shut the door, and the door "slammed" in Henderson's face. Before the door closed, Henderson was able to see a young lady, lying on her stomach on the bed. She was saying, "You're supposed to be my friend. You're supposed to be my friend." Someone behind Andrea appeared to be having sexual intercourse with her.

Melvin Rasberry testified reluctantly as a prosecution witness. He was a friend of appellant and Corey. He testified that he was extremely drunk on the night in question. At one point, as he was walking to the bathroom, past the bedroom where Andrea was resting, he heard her say, twice, "Take it out, it's hurting." Melvin "just kept on walking to the bathroom." When he came out, he saw appellant "in the hallway" and Corey in the bedroom "comforting" Andrea. Melvin thought "Dexter was at the end of the bed" at that time.

When Melvin, Corey, and appellant were ready to leave, they went to look for Dexter. (The four friends had also arrived at the party together.) According to Melvin, they found Dexter "playing with himself" at the edge of the bed where Andrea was. They took Dexter to the car. In the car on the way home, appellant said that he "got some." According to Melvin, Dexter asked, " 'Was it as good as mine?,' ... [i]mplying that ... [he] had 'got some,' " too. Despite having been repeatedly questioned by authorities, Melvin had never made this representation about Dexter prior to the court-martial.

Corey Lyons, another of appellant's friends, testified that he played "quarters" at Andrea's house. When he went to tell Andrea good-bye, she was "hysterical." Corey thinks Dexter might have been passed out in the corner of the bedroom. According to Corey, as he, Melvin, and appellant were leaving the house, appellant said, "Man, we ran a train on" Andrea, and appellant said that he "got some."

Andrea was the last prosecution witness. She testified that she remembered playing "quarters" but did not recall how she got to the bedroom. She was awakened by "a real sharp pain in [her] behind" and told whoever was there to leave her alone. She testified that she heard two voices, but only knew what one of them was saying. That person said, "Hurry up ... I'm next." Andrea woke up the day after the party to find herself naked from the waist down, with her sweater and bra pushed up around her neck. She was "spotting" and "felt like sticky."

The defense called Airman Richard Williams as a witness. He had been a boyfriend of Andrea; and he, too, was at the party. He testified that he called Andrea the day after the party, and she told him what she suspected had happened. According to Williams, Andrea also stated, "[T]he bad thing about it is I don't know if I wanted it or not."

Andrea's sister was in attendance at the court martial, and she heard William's testimony. During a break in the proceedings, the sister, who had had no previous contact with the prosecution, approached the prosecutor and told him that Williams' testimony was false. The prosecution promptly called the sister as a witness in rebuttal of Williams' trial testimony. Over defense objection, she testified that she was with Andrea throughout the phone call from Williams and that Andrea never said what Williams claimed she said about possibly consenting.

II

Though he did not do so at trial, appellant now contends that the evidence shows that his friends, Melvin, Corey, and Dexter, were culpably involved in any offenses committed on May 12, 1990, and that the military judge, *sua sponte*, should have given a separate accomplice instruction. Appellant does not here suggest what instruction the military judge should have given; however paragraph 7–10, Military Judges' Benchbook at 7–15 (Dept. of the Army Pamphlet 27–9 (1 May 1982)), contains an example. *See* Appendix.

Instead, the military judge gave the following general instruction on witness testimony:

Now, you have the duty to determine the credibility of the witnesses. In performing this duty, you must consider each witness' intelligence, ability to observe and accurately remember, sincerity and conduct in court, and any friendships or prejudices towards either party. Consider also the extent to which each witness is either supported or contradicted by other evidence; the relationship each witness may have to either side; and how each witness may be affected by the verdict.

In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate lie.

Taking all these matter into account, you should then consider the probability of each witness' testimony and the inclination of the witness to tell the truth.

In *United States v. Gillette*, 35 MJ 468 (1992), we held:

[w]henever the evidence raises a reasonable inference that a witness may have been an accomplice or claims to have been an accomplice of the accused, *and upon request of either the Government or defense*, the military judge shall give the members a cautionary instruction regarding accomplice testimony. First, the members shall be instructed how to determine whether a witness is an accomplice. Second, they shall be given the standard instruction regarding the suspect credibility of accomplice testimony.

*Id.* at 470 (emphasis added).

■ Following *Gillette*, a defense failure to request an accomplice instruction constitutes waiver, albeit there may be a case where a judge's failure to give such an instruction would be "plain error." RCM 920(f), Manual for Courts–Martial, United States, 1984; *United States v. McFarlin*, 19 MJ 790, 794 (ACMR), *pet. denied*, 20 MJ 314 (1985); *cf. United States v. Lee*, 6 MJ 96, 97 (CMA 1978). Plain error is obvious and substantial error that prejudicially influenced the deliberations of the members. *United*

*States v. Fisher*, 21 MJ 327, 328 (CMA 1986). This is not such a case.

Here, while there is evidence that others were in the bedroom with Andrea at various points, it is far from clear that any were in the room when appellant allegedly was having sex with Andrea. In addition, it is completely unclear who those persons might have been, or whether they also had sex with Andrea or otherwise participated in appellant's offense. The test for "determining whether a witness is an accomplice is whether the witness himself could have been convicted of the same crime for which the defendant is being prosecuted." *United States v. McKinnie*, 32 MJ 141, 143 (CMA 1991), *citing United States v. Scoles*, 14 USCMA 14, 19, 33 CMR 226, 231 (1963). On this bizarre record, the evidence simply fails to suggest which, if any, of these individuals might have been appellant's accomplices.

Moreover, the military judge gave a general witness-credibility instruction which plainly informed the members to take into consideration, *inter alia*, each witness' "sincerity ... friendships or prejudices towards either party [and] the extent to which each witness is either supported or contradicted by other evidence," as well as "how each witness may be affected by the verdict." Given the testimony presented here, the court members could have had few illusions about the character and circumstances of appellant's friends—none of whom identified appellant as having sex with Andrea. For whatever weight their testimony may have carried, the members could hardly have failed to view it with great suspicion. Appellant's waiver is not absolved by plain error.

### III

The remaining issue concerns the fact that Andrea's sister was allowed to testify in rebuttal after sitting through all of appellant's court-martial. Noting that Mil.R.Evid. 615, Manual, *supra*, provides for the sequestration of witnesses, appellant contends the military judge erred in allowing Andrea's sister to testify.

■ Mil.R.Evid. 615 provides for the exclusion of witnesses "[a]t the request of the

prosecution or defense" or *"sua sponte"* by the military judge "so that they cannot hear the testimony of other witnesses." (Emphasis added.) The purpose of the "rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." *United States v. Croom*, 24 MJ 373, 375 (CMA 1987), quoting *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir.1981) (citations omitted); *see also United States v. Gordon*, 27 MJ 331, 332 (CMA 1989).

■■ While Mil.R.Evid. 615 is applicable to rebuttal witnesses, *see United States v. Ell,* 718 F.2d 291 (9th Cir.1983), clearly, it can only be applied to *known* witnesses.

*United States v. Cortwright*, 528 F.2d 168, 176 (7th Cir.1975). Here, the Government did not know Andrea's sister could testify to any relevant issue until after Airman Williams had testified and Andrea's sister approached trial counsel.[2] Under these circumstances, we see no abuse of discretion in the military judge's decision to allow Andrea's sister's testimony. *United States v. Croom*, 24 MJ at 375.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.

---

2. It is unclear from the record if a formal order of sequestration was entered by the military judge. He did state, however, "Let me direct that you keep an eye on the spectator area and if a potential witness does enter the court, let me know so that we can have that person step out."

We will assume this was such an order. *See generally United States v. Ell,* 718 F.2d 291 (9th Cir.1983).

## APPENDIX

### 7-10. Accomplice Testimony.

Instructions on accomplice testimony should be given whenever the evidence tends to indicate that a witness adverse to the accused was culpably involved in a crime with which the accused is charged. The instructions should be substantially as follows:

You are advised that a witness is an accomplice if he/she was criminally involved in an offense with which the accused is charged. The purpose of this advice is to call to your attention a factor specifically affecting the witness' believability, that is, a motive to falsify his/her testimony in whole or in part, because of an obvious self-interest under the circumstances. (For example, an accomplice may be motivated to falsify testimony in whole or in part because of his/her own self-interest in receiving (immunity from prosecution) (leniency in a forthcoming prosecution) (_____)). The testimony of an accomplice, even though it may be ((apparently) (corroborated) and) apparently credible, is of questionable integrity and should be considered by you with great caution.

In deciding the believability of (state the name of the witness), you should consider evidence including but not limited to (specify significant evidentiary factors indicating that the witness may have been an accomplice).

Whether or not (state the name of the witness), who testified as a witness in this case, was an accomplice is a question for you to decide. If (state the name of the witness) shared the criminal intent or purpose of the accused, if any, or aided, encouraged, or in any other way criminally associated or involved himself/herself with the offense with which the accused is charged, he/she would be an accomplice whose testimony must be considered with great caution.

(Additionally, the accused cannot be convicted on the uncorroborated testimony of a purported accomplice *if* that testimony is self-contradictory, uncertain, or improbable).

(In deciding whether the testimony of (state the name of the witness) is self-contradictory, uncertain, or improbable, you must consider it in the light of all the instructions concerning the factors bearing on a witness' believability.)

(In deciding whether or not the testimony of (state the name of the witness) has been corroborated, you must examine all the evidence in this case and determine if there is independent evidence which tends to support the testimony of this witness. If there is such independent evidence, then the testimony of this witness is corroborated; if not, then there is no corroboration. (You are instructed as a matter of law that the testimony of (state the name of the witness) is uncorroborated).)

*Reference:*

Paragraph 74a(2), MCM, 1969 (Rev.)